IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

WALTER SHUKER, et al.   :   CIVIL ACTION
                        :   NO. 13-CV-6158
            Plaintiffs  :
                        :
        vs.             :   Philadelphia, Pennsylvania
                        :      July 16, 2014
SMITH & NEPHEW, PLC,    :
et al.                  :
            Defendants  :   ORAL ARGUMENTS HEARING
- - - - - - - - - - - - - - - - - - - - - - - - - - -

- - -

BEFORE THE HONORABLE JUAN R. SANCHEZ
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:     ERIC G. ZAJAC, ESQUIRE
                        ROBERT L. ASTRACHAN, ESQUIRE
                        ZAJAC ARIAS & TRICHON, P.C.
                        1835 Market Street, Suite 2626
                        Philadelphia, Pennsylvania  19103

For the Defendant:      PATRICIA M. PETROWSKI, ESQUIRE
                        SIDLEY AUSTIN, LLP
                        One South Dearborn Street
                        Chicago, Illinois  60603

                        DAVID W. O'QUINN, ESQUIRE
                        IRWIN FRITCHIE URQUHART & MOORE
                        400 Poydras Street, Suite 2700
                        New Orleans, Louisiana  70130

                        JOSEPH J. MAHADY, ESQUIRE
                        REED SMITH, LLP
                        1650 Market Street
                        2500 One Liberty Place
                        Philadelphia, Pennsylvania  19103

- - -

ESR Operator:          Patrick Kelly


TRANSCRIBED BY:    Drummond Transcription Service
                   Haddon Heights, New Jersey  08035

     Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1             (At 1:33 p.m. in Courtroom 11a.)

2             ESR OPERATOR:  Court is now in session.  The Honorable

3    Juan R. Sanchez presiding.

4             THE COURT:  Good afternoon, everyone.

5             ALL PRESENT:  Good afternoon, your Honor.

6             THE COURT:  You may be seated.

7             This is the matter of Walter Schuker versus --

8    defendants -- Smith & Nephew. PLC and Smith & Nephew, Inc.

9             I believe I have Mr. Zajac.

10            MR. ZAJAC:  Yes, your Honor, good morning --

11            THE COURT:  And --

12            MR. ZAJAC:  -- good afternoon.

13            THE COURT:  -- Mr. Astrachan.

14            MR. ASTRACHAN:  Good afternoon.

15            THE COURT:  I believe we also have attorney Petrowski.

16            MS. PETROWSKI:  Good afternoon, your Honor.

17            THE COURT:  And we have Attorney O'Quinn.

18            MR. O'QUINN:  Good afternoon, your Honor.

19            THE COURT:  And I believe, lastly, we have Attorney

20   Mahady.

21            MR. MAHADY:  Good afternoon, your Honor.

22            THE COURT:  All right.

23            Perhaps, what I would like to do first -- I'm going to

24   reverse the order a little bit.  And I want to hear argument on

25   the motion pertaining to Smith & Nephew, PLC, the personal-

1    jurisdiction issue.

2              MS. PETROWSKI:  Sure.

3              THE COURT:  All rise.  Why don't you come forward.

4              Now, since you filed your motion to dismiss as you

5    well know, the plaintiff have filed their second amended

6    complaint.

7              And my question to you is, do the allegations of the

8    proposed second amended complaint impact your jurisdictional

9    argument and if so, how?

10             MS. PETROWSKI:  To be honest, your Honor, because our

11   motion was directed to the first amendment complaint, I don't

12   know the answer to that question.

13             THE COURT:  Okay.  So, let's -- let's then move on.

14             PLC involvement with the Birmingham Hip Resurfaces

15   System and in particular, the R3 medal liner, what is PLC's

16   involvement with those systems?

17             MS. PETROWSKI:  Sure.

18             A couple of things, your Honor.

19             First, with respect to the sworn statements that we've

20   attached to our motion --

21             THE COURT:  Right.

22             MS. PETROWSKI:  -- those relate to the R3 Acetabular

23   system.

24             THE COURT:  Right.

25             MS. PETROWSKI:  And the reason for that, your Honor,

1   is because all of the allegations in the first amended complaint

2   go back to the acetabular system, themselves.  So, we did not

3   address the issue with respect to the BHR.

4           That being said, your Honor, PLC is a holding company

5   and the sworn statements of the affidavits would apply with

6   equal force.   PLC is not in the business -- as plaintiffs

7   contend -- of designing, developing, testing, manufacturing,

8   assembling, promoting, labeling, packaging, advertising,

9   marketing, distributing and selling medical devices -- any

10  medical devices, including the acetabular system.

11          THE COURT:  Okay.

12          But they -- they have put forward some evidence with

13  regards to PLC and -- that that claim meets the -- the criteria

14  for personal -- personal jurisdiction, either on a specific

15  jurisdiction theory or -- or general jurisdiction, but

16  particularly, personal jurisdiction regarding what page of -- of

17  the holding company and what it advertises and things that they

18  have done.

19          So, what is your response to that?

20          MS. PETROWSKI:  Sure, your Honor.

21          I -- I don't think that any of the conclusory

22  statements made in the plaintiffs' response refute the specific

23  sworn statements in either of our affidavits.  That -- that

24  being said, let's look at some of the specific things that --

25  why I say that -- and apply it also in the context of the law.

1     With respect to specific jurisdiction, an assertion of

2  specific jurisdiction is only proper where plaintiffs' claims

3  arise out of conduct that defendant purposefully directs at

4  Pennsylvania.  And this comes out of the O'Connor versus Sandy

5  Lane Hotel case that's cited in our case -- or in our -- in our

6  brief.

7     Yet none of the so-called jurisdictional facts that

8  the plaintiffs cite demonstrate that their claims -- which stem

9  from the manufacturer, the advertising, the sale and

10 implementation of system -- arise out of conduct that PLC

11 purposely -- purposefully -- directed at Pennsylvania.

12     So, first, let's look at the arguments and I can tick

13 through them, one after another, your Honor.

14     Plaintiff's first claim that PLC purposefully directed

15 conduct towards Pennsylvania by -- again -- directly designing,

16 developing, testing, manufacturing, assembling, promoting,

17 labeling, packaging, advertising, marketing, distributing and/or

18 selling medical devices, including the R3 Acetabular system

19 and/or parts from the BHR System.

20     But -- but, again, your Honor, this is a conclusory

21 statement that is directly and wholly contradicted by the sworn

22 affidavits of Susan Swabey and John Clausen, one representative

23 from PLC and one representative From INC.

24     In addition to that very broad and conclusory

25 statement, plaintiffs contend that PLC has actively traded on

1    the floor of the New York Stock Exchange.  In fact, your Honor,

2    PLC's stock is not traded on the New York Stock Exchange.  What

3    is traded is something known as an American Depository Share and

4    that's a security that's held or issued by a U.S. Depository

5    Bank outside of the U.S., that represents one or more shares of

6    foreign stock.

7         And, your Honor, courts have held that listing ADSs,

8    these American Depository Shares does not in and of itself

9    without more and this goes back to the test of whether the

10   claims arise out of conduct that was purposefully directed at

11   Pennsylvania.

12        So, the listing of these ADSs on the New York Stock

13   Exchange does not in and of itself confer jurisdiction.  Again,

14   your Honor, the inquiry has to be whether plaintiffs' claim

15   arise out of conduct that PLC purposefully directed towards

16   Pennsylvania.

17        And here there's no argument by plaintiffs nor can

18   there be, that their product's liability and breach of warranty

19   claims somehow arise out of these ADSs being listed on the New

20   York Stock Exchange.

21        Third, plaintiffs contend that PLC spent millions of

22   dollars on research and development in 2013.  And what they say,

23   your Honor -- if you look at their brief -- they say that:

24        Presumably, at the time of the development of the

25        R3 Acetabular System, PLC spent millions to develop

1       products for distribution into Pennsylvania.

2           There's nothing to substantiate these, your Honor.

3   If -- if you look at where they found this particular excerpt,

4   it came from the Smith & Nephew website.  And the excerpt,

5   itself -- as plaintiffs indicate on the face of their brief --

6   comes from 2003.  There is nothing -- or I'm sorry -- from 2013.

7   There is nothing tying this excerpt from 2013 to the relevant

8   time period of when the system, either, the R3 Acetabular System

9   or the BHR System was actually developed.

10          The website, furthermore, it doesn't indicate that it

11  was PLC as opposed to another Smith & Nephew entity that spent

12  the money on research and development.  Moreover, it -- it

13  doesn't say anything to suggest that the money -- these millions

14  of dollars -- were actually spent on the system at all, it's

15  just a general reference to research and development.

16          And remember, your Honor, the burden of proof is on

17  plaintiffs here.  They have to show by a preponderance of

18  evidence, that jurisdiction attaches to PLC.

19          And here, if you -- if you really drill down and look

20  at this excerpt, especially, this particular argument, it's

21  nothing but speculation, particularly, in light of the sworn

22  statements to the contrary that PLC is not involved in the

23  development of medical devices, including the R3 Acetabular

24  System.

25          Fourth, plaintiffs contend that the president of INC.,

1   is also an executive officer of PLC.  However, again, if you

2   look at the sworn statements, the boards are not overlapping,

3   your Honor, there may be one director that is an executive --

4   the president might be an executive officer of PLC.  But there's

5   no direct alignment among the officers of INC and the officer of

6   PLC.  And plaintiffs make no claims to the contrary, moreover,

7   the affidavits, themselves, bear out that they do have separate

8   officers and directors.

9        And the case law is pretty clear on that front as

10  well, your Honor, that there -- there may be an officer that

11  overlaps, but it's only in situations where the boards are

12  completely congruent, that jurisdiction, typically, attaches.

13  And, again that's just not the case here.

14       Fifth, plaintiffs contend that there are press

15  releases announcing -- announcing -- both the launch and the

16  recall of the system on the website for PLC.  Again, this is

17  Smith & Nephew's website and these press releases are in

18  Exhibits F and I of plaintiffs' response brief.

19       And -- and again, if you look at those press releases,

20  themselves -- and perhaps, we should do that right now.

21       (Pause at 1:44 p.m.)

22       THE COURT:  I have them.

23       MS. PETROWSKI:  So, if you'd turn, your Honor, to

24  Exhibit F of plaintiffs' response brief.  This is an excerpt

25  from the website that's titled, Smith & Nephew Launches the R3

1  Acetabular System.

2       THE COURT:  Hm-hmm.

3       MS. PETROWSKI:  And again, plaintiffs are claiming

4  here that PLC is -- is making this release.  But if you look at

5  the text of the release, itself, it says:

6       Memphis, Tennessee and San Francisco, California,

7       March 6th, 2008, Smith & Nephew, Inc. orthopedic

8       reconstruction business today announced the global

9       launch of the R3 Acetabular System.

10      This doesn't say anything in here that PLC was

11  announcing that system.

12      Similarly, with respect to the recall of the system

13  and also, the launch of the system, plaintiffs contend that

14  inquiries at the bottom of these press releases are supposed to

15  be directed to PLC.  And, yes, that is true, your Honor, there

16  is a provision in these press releases for inquiries to be

17  directed to an individual at PLC.

18      It's also equally true that if you look at these press

19  releases, there is also a provision for media inquiries,

20  investor inquiries to be directed at someone at INC., as well.

21  And there are contacts both for someone at PLC and someone at

22  INC.

23      The plaintiffs contend that PLC tries to distance

24  itself from the BHR in -- in our motion.  I -- I don't think

25  that that was an intentional act on our part, your Honor, as I

1  stated at the outset, the reason why our motion speaks to the R3

2  Acetabular System is because all of the allegations of the first

3  amended complaint relate back to that system, not the BHR.

4        But in any event, your Honor, as I stated at the

5  outset, as the sworn statements of John Clausen and Susan Swabey

6  clearly demonstrate, PLC is a holding company, it's simply not

7  involved in the manufacture, sales, distribution, et cetera of

8  medical devices.

9        And there's nothing in any of the statements,

10  arguments, so-called evidence that plaintiffs put up, to review

11  -- to refute or somehow counter the statements that are in the

12  affidavits.

13              THE COURT:  Very well.

14              MS. PETROWSKI:  At --

15              THE COURT:  Go ahead.

16              MS. PETROWSKI:  -- do you have a question?

17              THE COURT:  I -- I -- why don't you finish.

18              MS. PETROWSKI:  Okay.

19              THE COURT:  I do have a question, because while I may

20  agree with you, that on the record, I think you have compelling

21  case for a dismissal of the case on the grounds of no personal

22  jurisdiction.  The Third Circuit has instructed our Courts, that

23  we should allow jurisdictional discovery unless we believe that

24  jurisdictional discovery is frivolous.

25              So, are their claims here frivolous, so that allowing

1   jurisdictional would be futile?

2       MS. PETROWSKI:  I think that I would address that

3   slightly differently, your Honor.  And -- and I guess, I would

4   say, first of all, I do think that they're frivolous as they

5   pertain to PLC, because I don't think that PLC is in the

6   business of manufacturing, distributing, marketing, et cetera.

7   Any -- any of the things that plaintiffs claim that PLC has been

8   doing to justify jurisdiction, we simply don't.

9       But I'd also like to take it a step further, your

10  Honor, jurisdictional discovery should not be authorized where

11  -- as here -- plaintiffs failed to make a preliminary showing of

12  jurisdiction.  And this gets back to the fact that under the

13  law, your Honor, the burden is on plaintiffs to show by a

14  preponderance of the evidence that jurisdiction attaches.

15      And in order to do so, your Honor, the Third Circuit

16  has said that plaintiffs must -- quote:

17          Present factual allegations that suggests with

18          reasonable particularity, the possible existence of the

19          requisite contacts between the party -- here, PLC --

20          and the forum state -- Pennsylvania.

21      And indeed, the Third Circuit has cautioned that:

22          A plaintiff may not undertake a fishing expedition

23          based only upon bare allegations under the guise of

24          jurisdictional discovery.

25      And here, I would argue, your Honor, that plaintiffs

1  have not alleged any facts that suggest with reasonable

2  particularity, that PLC maintains minimum contacts with

3  Pennsylvania required to support an exercise of personal

4  jurisdiction.

5         Plaintiffs have not alleged nor can they demonstrate:

6         One, that their claims arise out of any PLC contact --

7  conduct.

8         Or, two, that PLC purposefully directed any such

9  conduct to PLC.

10        And if you look at what the plaintiffs are seeking in

11  their discovery, I don't know how it can be characterized as

12  anything other than a fishing expedition.  Plaintiffs' purported

13  discovery requests on jurisdictional issues, your -- alone, your

14  Honor -- include fifteen requests to admit and over sixty

15  Interrogatories with multiple sub parts.

16        And if you look -- if you drill down in to the

17  discovery requests -- and what exactly it is that plaintiffs are

18  seeking, I -- I'd contend that they're seeking the very facts

19  that they should have alleged in the first instance to show with

20  reasonably particularity, the possible existence of the

21  requisite contacts between PLC and Pennsylvania.

22        So, for example, your Honor, if you look at

23  Interrogatory Nos. 11, 12, 15, 17 through 21, 23 through 25 and

24  27 through 36 and by my tally, that's twenty-one of the sixty

25  that they've propounded.   These Interrogatories seek detailed

information regarding and any and all contacts during the past

ten years between PLC, its affiliates or its subsidiaries and

any person or entity in Pennsylvania, including customers,

affiliates and subsidiaries.

Now, I would contend, your Honor, you -- I would

contend, your Honor, that this is the very stuff that should

form the basis of their allegations with respect to

jurisdiction.

And then, your Honor, almost all of the remaining

discovery requests cover subjects that have already been

answered by the sworn statements that were attached to our

motion and some of these issues pertain to the alter-ego theory

of jurisdiction.

So, in particular, whether PLC and INC observed

corporate formalities?  Whether PLC controls the day-to-day

operations of INC?  Whether PLC conducts any business related to

medical devices and including the R3 Acetabular System?  Whether

PLC approves or directs any business decisions relating to the

system?

And, again, your Honor, if you look at -- there's one

Eastern District of Pennsylvania case -- this is the FC Food

Company versus Holt Cargo System case that we've cited to in our

brief.  There they denied jurisdictional discovery where

plaintiffs countered defendant's sworn affidavits with mere

speculation.  And I would contend that that's exactly what's

1    going on here as we have discussed previously.

2          And, finally, your Honor, if you'd like to hear there

3    is plaintiffs' argument with respect to the alter-ego theory.

4          THE COURT:  Go ahead, briefly --

5          MS. PETROWSKI:  Okay.

6          THE COURT:  -- you could respond to that.

7          MS. PETROWSKI:  Sure.

8          And, again, I'd like to discuss -- sort of -- the

9    legal standard that applies to this argument.

10          The Third Circuit has held that the requirements for

11    piercing the corporate veil are quote, demanding, unquote.

12          And the case law within the Third Circuit highlights

13    many factors, courts may consider in assessing whether a parent

14    is the alter ego of its subsidiary.  But, ultimately, the

15    plaintiff must demonstrate that, quote:

16          The degree of control exercised by the parent is

17          greater than normally associated with common ownership

18          and directorship.

19          And for that, your Honor, we rely on Arch v. The

20    American Tobacco Company case.

21          And so, plaintiffs make a number of arguments, that

22    PLC owns indirectly INC, that PLC owns the rights to the

23    trademark of Smith & Nephew in the United States, that PLC and

24    INC share common websites.

25          They, again, go through the press releases, both

1    launching the system and subsequently, recalling the system.

2    And they contend that this is the -- the stuff to show that --

3    the degree of control exercised by PLC is greater than that

4    normally associated with common ownership and directorship.

5         But -- but, again, your Honor, none of these facts

6    that plaintiffs put forth contradict the affidavits that have

7    been submitted by Susan Swabey and John Clausen.  PLC is a

8    holding company, again, it -- it doesn't conduct operations.

9    Courts have generally been disinclined to find a parent company,

10   particularly, holding companies constitute an alter ego, because

11   the subsidiary is not performing a function that the parent

12   would, otherwise, have had to perform, itself.

13        Ex -- expressly stated in the affidavit, your Honor,

14   is the fact that PLC is not involved in the day-to-day

15   operations of INC.  Rather, PLC's oversight authority entails

16   approval of the most significant capital expenditures and

17   strategy business decisions.  That's something that we've

18   offered up in our affidavits.  Plaintiffs then in their response

19   try to use that against us, but even one of the cases that

20   plaintiffs rely upon and that's the In Re:  Latex Gloves Product

21   Liability litigation case says that:

22        High-level strategic business decisions are precisely

23        the type of matters one would expect a parent company to

24        be involved in and they fall short of demonstrating that

25        PLC is the alter ego of INC.

1          And -- and, in fact, that particular case, your Honor,

2     says:

3          A parent may be involved in the -- quote -- monitoring

4     -- of the subsidiary's performance, supervision of the

5     subsidiary's finances and capital-budget decisions and

6     articulation of general policies and procedures -- end quote --

7     without becoming its subsidiary's alter ego.

8          In sum, your Honor, I -- I don't think that, either

9     the applicable law, either, as it pertains to the specific

10    jurisdiction argument, the alter-ego theory or plaintiffs'

11    requests discovery, coupled with the facts in this case,

12    supports a finding of personal jurisdiction over PLC.

13          THE COURT:  Very well.  Thank you very much.

14          (Pause at 1:56 p.m.)

15          THE COURT:  You're -- you're trying or making an

16    effort here at bringing a parent company within the purview of

17    this case and you have two compelling affidavits there, that

18    demonstrate that this company has no contact, no design, no

19    development, no testing, no manufacturing, assembly, promotion,

20    package, label, they don't anything and they don't even sell in

21    the U.S., it's the subsidiary company that is involved in this

22    case, the subsidiary company admitted that.

23          So, tell me, factually, what are the facts that

24    support your theory, that they have -- that PLC in this case --

25    has directed their activities at the forum state of

1    Pennsylvania?

2              MR. ASTRACHAN:  Good afternoon, your Honor.

3              What I'd like to do is, I'd like to point out at the

4    beginning, the specific things in the affidavit that we think

5    demonstrate the type of control we're talking about.

6              THE COURT:  In whose affidavit, the two affidavits

7    that --

8              MR. ASTRACHAN:  Susan Wabey's.

9              THE COURT:  Okay.

10             MR. ASTRACHAN:  For both the specific jurisdiction in

11   this case and that based on the alter-ego theory.

12             So, in the affidavit, they say that they do have

13   oversight, they have oversight over --

14             THE COURT:  For what?

15             MR. ASTRACHAN:  -- over strategic --

16             THE COURT:  For that, that doesn't make -- that

17   doesn't give you personal res -- personal jurisdiction --

18             MR. ASTRACHAN:  Well --

19             THE COURT:  -- of the -- of the company or this case.

20             MR. ASTRACHAN:  -- well, they said that there's no

21   common officers, like I said --

22             THE COURT:  It's a parent company -- it's a parent

23   company.

24             MR. ASTRACHAN:  -- the common officers are completely

25   shared.  These press releases that they say only come from Smith

1 & Nephew, Inc., if you look at them, they tell you,

2 specifically, they come from the holding company that has stocks

3 in the New York Stock Exchange that she tries to minimize.

4 They're the ones writing these press releases for the R3 metal

5 liner, for the launch of the R3 System.  All inquiries are

6 directed to them.  And they share common officers and directors.

7       The R3 liner that we're talking about and we point out

8 in our brief was made in the United Kingdom.  This parent is

9 coordinating the activities of its subsidiaries and directing --

10       THE COURT:  Why -- why do you want this company, a

11 parent company in this case, when you have INC, who is the

12 manufacturer, the designer of the system in this case, what's

13 the point?

14       MR. ASTRACHAN:  They hold responsibility for the

15 injuries caused to my client.

16       THE COURT:  You have a company here, right, that I

17 suspect is sufficiently capitalized, right, to afford any -- any

18 verdict -- should this case proceed -- any verdict that any jury

19 will award, right?

20       MR. ASTRACHAN:  Your Honor, I -- respectfully -- I

21 don't think that that's relevant to this topic.  I think we've

22 brought them in, 'cause we --

23       THE COURT:  Whether it's relevant --

24       MR. ASTRACHAN:  -- think that they're responsible.

25       THE COURT:  -- it's relevant or not, could you answer

1    my question?

2              MR. ASTRACHAN:  Can you repeat it?

3              THE COURT:  You have a capitalized company here, that

4    can afford any verdict that a jury may award in this case,

5    right?

6              MR. ASTRACHAN:  I'm not -- I can't answer as to that.

7              THE COURT:  Very well.

8              MR. ASTRACHAN:  But I'd just like to continue pointing

9    out some things that I've found troubling with what she said.

10             She told you earlier today that this company is not in

11   the business of medical devices.  Their own website in Exhibit

12   A touts their global medical-technology business.

13             The trademark that she confirms exists is for medical

14   devices in the United States.  I don't think that that could be

15   minimized when you look at the totality of the factors, you have

16   to look at all of the activity that they've conducted.  Their

17   trademark is very important, if they hold it, they have the

18   right to enforce these trademarks --

19             THE COURT:  Where on Exhibit --

20             MR. ASTRACHAN:  -- what --

21             THE COURT:  -- where on Exhibit A, where it says,

22   Smith & Nephew is in the global medical-technology business,

23   does it say -- does it mention PLC, it's not there, is it?

24             MR. ASTRACHAN:  No, it's not, your Honor, but I'd

25   submit --

1          THE COURT:  Right.

2          MR. ASTRACHAN:  -- they haven't denied that that's

3    their website.  And I believe that that's their website --

4          THE COURT:  It doesn't identify the PLC, it says,

5    Smith & Nephew, doesn't it --

6          MR. ASTRACHAN:  I -- I suppose it does.

7          THE COURT:  -- and Smith -- and Smith & Nephew, Inc.,

8    which is the company involved with the manufacturing and

9    production of the product in this case, sells in the

10   international market, right?

11         MR. ASTRACHAN:  I can't verify if that's --

12         THE COURT:  Okay.

13         MR. ASTRACHAN:  -- true or not, but --

14         THE COURT:  But you do admit, it doesn't identify

15   PLC --

16         MR. ASTRACHAN:  I think --

17         THE COURT:  -- right?

18         MR. ASTRACHAN:  -- I can admit that.

19         THE COURT:  Okay.

20         And on Exhibit F -- as she pointed out -- it doesn't

21   identify it as PLC, it says, basically, Smith & Nephew, Inc.,

22   right?

23         MR. ASTRACHAN:  No, I don't agree with that, when --

24         THE COURT:  Well, let me read it to you --

25         MR. ASTRACHAN:  -- look at --

1          THE COURT:  -- let me read it to you:

2          Smith -- it's Memphis, Tennessee, San Francisco,

3     California, March 6th, 2008:

4               Smith & Nephew, Inc., right, orthopedic reconstruction

5          business today announced the global launch of the R3

6          Acetabular System, an advanced multi-bearing and

7          Acetabular cup system used in total hip replacement

8          procedures.

9               Doesn't it say that?

10          MR. ASTRACHAN:  Right.

11               But let me point this out for a second.  Do you see

12     where it's says:

13          New York Stock Exchange, SNN, LSE, SN?

14          THE COURT:  Okay.

15          MR. ASTRACHAN:  Right.

16               When you look at Exhibit C, that's from the New York

17     Stock Exchange website --

18          THE COURT:  I --

19          MR. ASTRACHAN:  -- and PLC's symbol is SNN.

20          THE COURT:  All right.

21          I'm talking about Exhibit F --

22          MR. ASTRACHAN:  And --

23          THE COURT:  -- that you've produced, Exhibit F doesn't

24     say, PLC, does it?

25          MR. ASTRACHAN:  (No verbal response.)

1          THE COURT:  You're reading another exhibit, I'm asking

2   you about Exhibit F.

3          MR. ASTRACHAN:  Right.

4          And on Exhibit F after it says, INC, it refers you to

5   the New York Stock Exchange, SNN is the symbol.  SNN is the

6   symbol for Smith & Nephew PLC.

7          THE COURT:  All right.  And that's what you're relying

8   on?

9          MR. ASTRACHAN:  Well, that's the entirety of it, like,

10  she spoke earlier, I think we're in agreement that this is a

11  multi-factorial test for the alter-ego theory and for specific

12  jurisdiction.  You're inquiring for specific jurisdiction as to

13  whether they purposefully direct --

14         THE COURT:  What activity -- I want you to point me to

15  one, two, three, four, five, six activities, that basically

16  leads me to the conclusion that this company -- which is a

17  parent company -- a holding company -- is directing their

18  activities at Pennsylvania, so that you could assert personal

19  jurisdiction.

20         MR. ASTRACHAN:  Right.

21         Well, like I said when I started, they did re --

22  Exhibit D touts that they did research and development --

23         THE COURT:  So, what?

24         MR. ASTRACHAN:  -- to create new products.

25         THE COURT:  So, what?

1    MR. ASTRACHAN:  So, if you look at -- there's case law

2   that shows that they -- and I'll find the specific -- the

3   specific case is, <u>Rockwell versus Custerzoni</u> (ph), is one that

4   they cited.  There was a -- I am not exactly sure if it was a --

5   I think it was a parent company with a subsidiary, that they

6   developed a product with the subsidiary to sell it within the

7   United States and they found them subject to personal

8   jurisdiction.

9        And it's because you can't just look at the exact

10  moment at time of the sale, right.  If they are doing research

11  and development to develop these products, one of them -- the --

12  R3 medal liner -- that was implanted, they'll concede it's not

13  even made in Memphis, it's made by another company in the United

14  Kingdom.

15       They're -- they're developing all of these products

16  and then, they have common officers.  She didn't deny that the

17  president of Smith & Nephew, Inc., is the same as a corporate

18  director of PLC.  They're coordinating activities between each

19  other to then sell products within --

20       THE COURT:  Where -- where do you get that?

21       MR. ASTRACHAN:  -- the United States.

22       THE COURT:  Wait -- that's -- that's an assumption

23  that you're making, right?

24       MR. ASTRACHAN:  I don't --

25       THE COURT:  And one person that might sit on multiple

1  boards doesn't make it -- I don't think that's enough, but --

2  but go ahead.

3         MR. ASTRACHAN:  Okay.

4         THE COURT:  Where did you get this fact, that they're

5  coordinating -- and I guess, conspiring is to -- to sell this

6  product in the United States as -- as if PLC was INC as well,

7  acting as if they were one?

8         MR. ASTRACHAN:  Right.

9         Well, I'm going over all the things -- I'm sorry --

10  that we get interrupted, you know, the back and forth here.

11         But like I said, the press releases are directing

12  inquiries to PLC for questions about the product's launch, for

13  questions about the -- and when we speak about the product, I'm

14  -- it's the R3 System's launch, we're not just talking about the

15  liner and for the withdrawal of the liner.  It demonstrates that

16  there is intimate involvement between PLC and what is being

17  produced and sold in the United States and when it's being

18  recalled.

19         Their trademark registration, again, like I mentioned,

20  the stock.  And know that there's billions of dollars of revenue

21  in the United States.  They can't say that this was a one-shot

22  kind of deal.

23         They cite to a case, <u>McIntyre versus Nicastro</u>, where

24  personal jurisdiction wasn't found, but that was a case where

25  the plaintiff didn't allege any control and there were a total

1  of four -- I'm not sure, exactly, what the equipment was -- but

2  four machines, actually, entered the United States.

3         THE COURT:  Very well.  Anything else?

4         MR. ASTRACHAN:  That's fine, your Honor.

5         THE COURT:  Okay.  Thank you.

6         Do you wish to respond?

7         MS. PETROWSKI:  I -- very briefly, your Honor --

8         THE COURT:  Go ahead.

9         MS. PETROWSKI:  -- if that's okay.

10        (Pause at 2:06 p.m.)

11        MS. PETROWSKI:  Your Honor, just very briefly.

12        You had asked plaintiffs' counsel to identify

13  activities or conduct that was sufficient to confer personal

14  jurisdiction.  And I think that I've addressed most of the

15  activities that Counsel mentioned.  But I'd just like to run

16  through a couple of them very quickly.

17        He talked about his assumption that PLC and INC were

18  coordinating activities.  In fact, the affidavits make it clear,

19  your Honor, that PLC was not involved in the day-to-day

20  operations of INC.

21        THE COURT:  He's just -- he's asking me to ignore

22  everything that is in the affidavit and look at the sparse

23  pieces of evidence that they've produced to establish personal

24  jurisdiction, that's basically their argument.

25        MS. PETROWSKI:  The -- yes, your Honor.

1          The same with the -- the research and development

2     piece, I mean, if you look at Exhibit C that's attached to their

3     response, it doesn't mention PLC or INC, it doesn't mention the

4     Acetabular System, the BHR System.  It's a general page off the

5     website discussing research -- research and development,

6     generally.  And from that plaintiffs' counsel contends that

7     somehow, PLC was pouring all of this money in to the research

8     and development of -- of these systems.  But, again, that's

9     directly refuted by the affidavits, themselves.

10          And, again, finally, plaintiff's counsel mentioned the

11    press releases directing the inquiries to PLC.  As we discussed

12    in my arguments on our motion, itself, if you'd look at those

13    press releases, the inquiries apply with equal force to

14    representatives of INC as well.

15          THE COURT:  Very well.  I think I understand the

16    arguments.

17          MS. PETROWSKI:  Okay.  Thank you, your Honor.

18          THE COURT:  Thank you.

19          Let me move on to the motion pertaining to Smith &

20    Nephew, Inc., the preemption issue.

21          MR. O'QUINN:  Thank you, your Honor.  Once again, I'm

22    David O'Quinn.  You probably recall that I was here back in

23    March, because this --

24          THE COURT:  Right.

25          MR. O'QUINN:  -- motion that we're here on today,

1  arose, originally, from a 12(b)(6) motion that we filed in

2  December.  In that motion, we argued that the plaintiffs' claims

3  were preempted, because the plaintiff alleged defects in a metal

4  liner that has received PMA approval from the FDA and,

5  therefore, the plaintiffs could not challenge the design or

6  labeling that applied to that product and were relegated to

7  showing a parallel claim, which we took the position then and

8  take the position now, they have not done so with specific

9  facts.

10       THE COURT:  Okay.

11       So, let me -- so, let me, perhaps, focus in on some of

12  these issues.  The R3 metal liner -- as you just stated -- it's

13  the only component that was used in Mr. Shuker's surgery and

14  it's the only component part that received pre-market approval.

15       So, with that understanding would you agree with me

16  that if plaintiffs' claim were based on defects in the other 5K

17  clear components of the R3 Acetabular System, that claim would

18  not be preempted?

19       MR. O'QUINN:  No, your Honor, and let me first of

20  all --

21       THE COURT:  Why not -- why not?

22       MR. O'QUINN:  Let me -- let me back up.

23       First of all, the shell -- although it's not material

24  to the motion -- the shell was actually also part of the BHR

25  System and cleared for it.  But here --

1       THE COURT:  The -- the --

2       MR. O'QUINN:  -- here's -- but I'm glad you've cut to

3  the chase, let me --

4       THE COURT:  Okay.

5       MR. O'QUINN:  -- let me -- let me get right to that.

6       THE COURT:  This -- this --

7       MR. O'QUINN:  They in their complaint --

8       THE COURT:  -- is on metal, let's deal with that -- go

9  ahead.

10      MR. O'QUINN:  Yes, sir.

11      THE COURT:  Go ahead, why don't you --

12      MR. O'QUINN:  Thank you for the question, I -- I

13  understand exactly where you're coming from and this is exactly

14  what the court had to deal with in <u>Simon</u> and <u>Bertini</u> (ph).

15      THE COURT:  Okay.

16      MR. O'QUINN:  The R3 metal liner sits inside of a cup

17  and a femoral component, okay.

18      The femoral component what it was approved for -- was

19  a resurfacing component.

20      THE COURT:  Right.

21      MR. O'QUINN:  Dr. Terefenko said, I'm not going to use

22  the resurfacing, I'm going to use a femoral component from over

23  here, it's a viable use between the 510K femoral component and

24  the PMA approved liner.  Okay?

25      The Court's question as I understand it is, what if

1    they alleged a defect in other components --

2         THE COURT:  In the other components.

3         MR. O'QUINN:  -- and I have two answers to that.

4         THE COURT:  Right.  And not the -- the -- and not the

5    metal liner, the R3 metal liner.

6         MR. O'QUINN:  The first answer and the one that I

7    think is -- is probably the most straightforward and the most

8    dispositive is, they don't allege defects in the other

9    components.  And if the Court will --

10        THE COURT:  But --

11        MR. O'QUINN:  -- bear with me --

12        THE COURT:  -- but -- but it -- your -- your point is,

13   factually, they don't or they can't, because it's metal on

14   metal, it was rubbing, right?

15        MR. O'QUINN:  Metal on metal and rubbing, but their

16   claims are contingent upon the liner and the fact that it's made

17   of metal and the risks associated with that use.

18        They do not allege that any other component standing

19   alone injured this plaintiff.  And I don't see how they can

20   allege that, given the fact that the only way these components

21   are going to emit metal is by rubbing against the liner.  And

22   then Simon and Bertini --

23        THE COURT:  From both sides, right, from both sides?

24        MR. O'QUINN:  By both sides, the cup as well.

25        THE COURT:  Right, right.

1        MR. O'QUINN:  Yes.

2        THE COURT:  So -- so, if I understand your position,

3  it's that his claims -- the injuries, his claims -- are all

4  directed in some way supposedly to the defect in the metal in

5  the -- in the R3 metal liner?

6        MR. O'QUINN:  No question about it.

7        And I've found my position in the notes, your Honor,

8  this is in the briefs, but Paragraph 43 of the first amended

9  complaint talks about:

10       The metal liner would interface with or house the

11       metal ball, femoral head component of the R3 Acetabular

12       System.

13       It's not the R3 Acetabular System, but let's just use

14  the fact, the liner interfaces with the ball.

15       Because of this interface, the combination of metal

16       components, the cobalt and chromium femoral head and the

17       cobalt and chromium liner was and is referred to as a

18       metal-on-metal bearing couple or a metal-on-metal system.

19       That's in Paragraph 43.

20       If you continue looking from Paragraph 43 through

21  Paragraph 59, those are the specific facts as to what the

22  plaintiff claims is defective.

23       He claims that the liner component -- not the other

24  components -- the liner component was withdrawn from the market

25  -- which it was -- because of a higher-than-expected revision

1  rate, meaning because it was rubbing against the people on those

2  other components and releasing metal, it had to be withdrawn

3  from the market.  That's their allegation.  They don't allege

4  that the shell was withdrawn, they don't allege that the -- that

5  the femoral component was withdrawn, they allege that the liner

6  was withdrawn, because it was rubbing against the other

7  components.

8      THE COURT:  Well, what -- had they or if they allege

9  defects in the other component parts that would not be

10  preempted, you agree with that?

11      MR. O'QUINN:  If we were writing on a blank slate, I

12  might, but I don't see how you can plausibly say after filing an

13  original complaint that said it was the liner, a first amended

14  complaint that said it was the liner that goes into detail about

15  what it is about the liner that causes these problems.  And

16  filing a motion to amend to file a second amended complaint,

17  that goes into defects of the liner.  I don't see how you can

18  plausibly take that all back and now say, it's not the liner,

19  it's --

20      THE COURT:  Well --

21      MR. ASTRACHAN:  -- something else.

22      THE COURT:  -- but because they are claiming that the

23  defects are with the liner, that has pre -- approval -- you

24  claim that -- the argument is the claim is preempted?

25      MR. O'QUINN:  Yes, your Honor.

1        And the -- and going a step further --

2

3        THE COURT:  And --

4        MR. O'QUINN:  -- the off-label use of the --

5        THE COURT:  -- but I'm not -- I want to get --

6        MR. O'QUINN:  Yes, sir.

7        THE COURT:  -- I want to get to the off-label use

8   later --

9        MR. O'QUINN:  Sorry.

10        THE COURT:  -- but I -- I want to understand from both

11   sides' perspective, the complete argument on preemption --

12        MR. O'QUINN:  May --

13        THE COURT:  -- because the part -- the metal liner --

14   which was part of the other system, the BHR system, is the one

15   that was -- that metal liner was used with the R3 Acetabular

16   System for the hip replacement here, that the doctor used.

17        MR. O'QUINN:  Correct.

18        THE COURT:  Okay.  I have questions on that.

19        But -- but the theory -- your theory -- is that

20   because their claim is that the problem -- the defect -- is with

21   the metal liner -- the R3 metal liner -- that automatically

22   preempts it, because you have pre-market approval, it's not a --

23   a 360 -- a 5K clear component, it is a -- I believe, a 360 pre-

24   market approval component, part of the BHR?

25        MR. O'QUINN:  The allegations are, that the metal

1    liner by itself and rubbing against the other components --

2              THE COURT:  Right.

3              MR. O'QUINN:  -- released metal --

4              THE COURT:  Right.

5              MR. O'QUINN:  -- that caused Mr. Shuker pain and some

6    disability and had to be taken out.  That claim seeks to

7    challenge the design and labeling for the liner component,

8    because the FDA said, you can make it out of metal.  And the FDA

9    approved labeling which specifically cautioned the doctor not to

10   use it -- well, they specifically, cautioned the doctor that it

11   wasn't approved with this femoral component.

12             But Dr. Terefenko chose to do so -- I know you don't

13   want to get into that yet.

14             THE COURT:  Right.

15             MR. O'QUINN:  So, but yes.

16             And if I may also add this, your Honor, before we

17   leave this topic, just to make sure I alert you to it.

18             This is the same issue that the <u>Simon</u> and <u>Bertini</u>

19   courts hit head on.  Just as your Honor has done, those judges

20   in the Southern District of New York said, wait a minute, there

21   are other components and they weren't PMA approved, what does

22   that do to you preemption argument?

23             And as in this case, the court said, look, everything

24   you're saying depends on that liner, it all revolves around the

25   articulation with that liner.  And what you're complaining about

1    is the fact that the liner was made of metal.

2          And any -- I'd submit to your Honor and you can read

3    the complaint -- any fair reading of the specific allegations of

4    their complaint, their complaining about the liner.  They're

5    saying that the liner was made of metal, the liner released this

6    stuff when it rubbed against the other thing, the -- we took it

7    off the market, 'cause it wasn't working.

8          And the -- in Paragraph 59, they say:

9          The pain caused by metal sensitivity due to the

10         degeneration of the metal-on-metal articulation -- that's

11         the liner rubbing against the other parts -- is why it

12         had to come out.

13         THE COURT:  All right.

14         MR. O'QUINN:  So, and -- and --

15         THE COURT:  Now --

16         MR. O'QUINN:  -- the Bertini court said:

17         You can't separate the liner out.

18         And the Simon court said:

19         You can't separate the -- the liner out.

20         THE COURT:  Now, to the extent that the plaintiffs are

21   challenging the adequacy of the warnings accompanying the R3

22   Acetabular System, why isn't that -- why is that claim preempted

23   according to you?

24         MR. O'QUINN:  Your Honor, when we got the PMA

25   approval, the FDA approved certain labeling for the device.  It

1   had a surgical technique brochure and some instructions for use,

2   which we've attached to the declaration of our regulatory

3   manager, Gino Rouse (ph).

4          That labeling is the labeling and Smith & Nephew

5   cannot change it, modify it or add to it without the FDA's

6   permission.  And unless and until the FDA says, change it, we

7   can't change it.  And a state law claim can't say, that we

8   should have distributed any other labeling, other than the

9   labeling the FDA approved.

10         And what they're saying is, you should have warned the

11  doctor about using this device in some other way or you should

12  have given him more information about metal sensitivity or

13  something like that.  But all of their claims are, basically,

14  you should have told the doctor something different or in

15  addition to what the FDA told you to say and they can't modify

16  that labeling, that's our position.

17         THE COURT:  Right.

18         Now, the documents that they have produced in support

19  of their motion for leave to amend, suggest to me that the

20  package insert for the R3 Acetabular System mentions R3 metal

21  liners, which are not approved for use in the United States.

22         So, my question is, will their claim that the package

23  insert will -- should warn -- that the R3 Acetabular System

24  should not be used with the R3 metal liner be preempted?

25         MR. O'QUINN:  The --

1       THE COURT:  In other words, the R3 Acetabular System

2  use in combination with the metal liner be preempted and why?

3       MR. O'QUINN:  Your Honor, with all due respect, I

4  don't think their arguing that the package insert said that.

5       What they did and what they attached to their motion

6  to amend, was they attached the labeling for the poly liner, not

7  the metal liner.

8       The poly liner doesn't mention -- excuse me -- doesn't

9  mention the metal liner.

10       The Court may recall that when we were here in March,

11  they had submitted the 510K documents for the poly liner.  And

12  they didn't have anything to do with the metal liner.  Now,

13  they're -- now, they're submitting the poly liner and saying

14  that that's evidence of off-label promotion.

15       But if you'll look at it, it says on the front, poly,

16  it's the poly liner, it doesn't say anything about the metal

17  liner.

18       We attached to the declaration of Mr. Rouse, the FDA-

19  approved information for the metal liner.  And the metal liner,

20  not only does it say, it's approved for resurfacing use, it

21  specifically cautions the doctor -- twice -- that the

22  resurfacing liner is not approved for use with the femoral

23  component, except the resurfacing component.

24       In other words, it specifically says, it's not

25  approved for the femoral component that Dr. Terefenko used.

1    So, with all respect, your Honor, I think that's a

2    garbling -- what they're trying to do, is garble the record,

3    because there's nothing in the package insert or in the FDA-

4    approved labeling that does not fully and completely disclose

5    the regulatory status of this liner.  And we attached that

6    labeling to the declaration of Mr. Rouse, which is un-

7    controverted.

8         THE COURT:  Very well.

9         In your -- in your motions, you also argue that

10   preemption applies to the device, not the use of the device.

11   For preemption purposes, what is the device in this case?

12        If -- if the device is the R3 metal liner, are there

13   federal requirements applicable just to the liner?

14        MR. O'QUINN:  Yes.

15        THE COURT:  Or are there federal requirements

16   applicable to the BHR System as a whole of which the R3 metal

17   liner is a part?

18        MR. O'QUINN:  Well, I think the Court asks multiple

19   questions and I'll do the best --

20        THE COURT:  Right.

21        MR. O'QUINN:  -- I can to answer them.

22        In this case, I --

23        THE COURT:  But all three go to the argument.

24        MR. O'QUINN:  -- I don't know that there is a device.

25   I think in this case, what you have is, you have a shell and a

1   liner that received PMA approval used off label with another

2   femoral component.  But the FDA cleared that liner as part of

3   the BHR System.

4          And the plaintiffs' argument seems to be that, well,

5   it was cleared as part of the system, so if it was used in some

6   other way, it takes it out of that approval.  That is incorrect

7   and I think all of the case law is against that.

8          When the FDA approved our device, it says, you shall

9   make it like this, you shall label it like that.  We cannot put

10  it into interstate commerce without doing what the FDA says.

11         In this case, we made it like the FDA said, we

12  packaged it like the FDA said and Dr. Terefenko said, well, I

13  see what you've got here, but I'm going to take this one off the

14  shelf and match it.

15         And the case law is clear that that decision by the

16  doctor to use it off label to use it off label does not defeat

17  the requirements applicable to the device.

18         The Court also asked, were there requirements just for

19  this component?  Absolutely.  And they're attached to the

20  declaration of Mr. Rouse.  We attached the -- some of the PMA

21  approval materials to that declaration.

22         The liner had to be made of cobalt chrome, it had to

23  be made of metal, it had to be made of metal of a certain alloy.

24  It had to be distributed with certain packaging.  There is no

25  allegation that we didn't distribute it with the packaging that

1   was supposed to go with it, except this poly liner thing, which

2   is obviously wrong and unsupported by any evidence and

3   controverted by Mr. Rouse's affidavit, which has the correct

4   labeling attached to it, which clearly discloses the regulatory

5   status.

6          We had to --

7          THE COURT:  Does it --

8          MR. O'QUINN:  -- we had to make certain reporting

9   obligations periodically to the FDA about the liner's use out in

10  the field and what problems physicians may have been

11  experiencing.

12         So, yes, sir, there were many and multiple

13  requirements available to this component.

14         THE COURT:  And regarding the warnings that must

15  accompany the -- the R3 metal liner, which you complied with?

16         MR. O'QUINN:  Yes, sir.

17         THE COURT:  Okay.

18         MR. O'QUINN:  There is a surgical-technique brochure

19  and instructions for use attached to Mr. Rouse's declaration,

20  which -- which was required by the FDA, that is the labeling we

21  were required to give out with this device.

22         THE COURT:  Separate -- approved separate labeling or

23  packaging for the specific metal liner?

24         MR. O'QUINN:  Yes, sir.

25         It's a -- a surgical-technique brochure for the R3

1     metal liner. The way this worked --

2          THE COURT: It's not just -- not -- not necessarily

3     for the BHR System as a whole?

4          MR. O'QUINN: There were two. And I -- I think we

5     only attached the surgical technique, but I think Mr. Rouse's

6     declaration talks about both. The BHR System was approved first

7     in 2007.

8          THE COURT: Right.

9          MR. O'QUINN: And there was a package insert and

10    instructions for use for the BHR System.

11         We got a supplemental approval for the R3 liner. The

12    FDA had a separate surgical-technique manual for that liner.

13    Now, on the front -- it's attached to the declaration -- on the

14    front it says, to be used in conjunction with the BHR System,

15    blah, blah, blah, blah.

16         But it's separate instructions about how to use that

17    metal liner in a resurfacing application with separate warnings

18    and separate instructions for use.

19         So, the answer, sir, is yes. There were actually two

20    in this case. One for the BHR System at first and a

21    supplemental one for the liner component itself.

22         THE COURT: Separate warnings for the metal liner and

23    they were inserted in the package?

24         MR. O'QUINN: Absolutely.

25         THE COURT: So, any -- any physician would be able to

1    know and understand that?

2              MR. O'QUINN:  Well, I'm not a physician --

3              THE COURT:  Well --

4              MR. O'QUINN:  -- but I'm assuming that we --

5              THE COURT:  -- they would have read --

6              MR. O'QUINN:  -- I can answer it this way, the FDA

7    told us to put it in the labeling and that's what we --

8              THE COURT:  And it was there.

9              MR. O'QUINN:  -- did.

10             THE COURT:  Okay, okay.

11             This is separate and apart from the warnings and the

12   instructions that were in the package for the BHR that were

13   initially approved --

14             MR. O'QUINN:  Yes, sir.

15             THE COURT:  -- pre-approved --

16             MR. O'QUINN:  Now, there is some overlap.  I mean,

17   obviously, the BHR System, some of the warnings were the same,

18   you know, like the BHR said, this can cause metal sensitivity,

19   you know, the BHR said, there's a metal liner literature out

20   there, you might want to go look at it.

21             So, some of that stuff was in the -- in the package

22   insert in the materials for the liner as well.

23             But if I understand your Honor's question, there --

24   there were separate requirements, including separate labeling

25   for this component.

1          THE COURT:  All right.

2          Now, to the extent that they challenged the adequacy

3   of the warnings in the labeling for the R3 Acetabular System and

4   not the BHR System or the R3 metal liner, why is that claim

5   preempted?

6          MR. O'QUINN:  Similar to what I've said before, the

7   FDA told us, this is the labeling thou shalt use.  And a state

8   law tort claim cannot add to or modify that labeling.

9          The plaintiffs, in essence, are saying that, you

10  should have told the doctor more about metal sensitivity or you

11  should have told him in more un -- you know -- stronger that he

12  shouldn't use it off label.  They're saying something.

13         But whatever they're saying, it's in addition to or a

14  modification of that labeling, which we cannot do and Section

15  360(k) says, a state law tort claim cannot do.

16         THE COURT:  Right.

17         I wanted to move on to the off-label promotion and

18  parallel claims --

19         MR. O'QUINN:  Yes, sir.

20         THE COURT:  -- unless you have anything else to add to

21  the questions I've posed.  I -- I try to get pointed questions,

22  so that I could understand the preemption argument --

23         MR. O'QUINN:  I -- and I appreciate --

24         THE COURT:  -- a little bit better.

25         MR. O'QUINN:  -- it, your Honor, I mean, you can

1  always read the brief.  I'm glad to know what's on the Court's

2  mind and now, hopefully, I've at least answered to you as to

3  what our position is.

4       THE COURT:  All right.

5       Now, moving on to the off-label parallel claim.

6       It seems to me that -- it seems to me -- and the

7  Ramirez decision has been heavily criticized and you disagree

8  with it.  But it seems to me that despite the fact that you

9  disagreed with that decision, you agree or acknowledge that the

10  promotion of off-label use in some circumstances can support a

11  parallel claim.

12       So, my question to you is -- and you could tell me if

13  I'm wrong in that assertion -- but would you agree, for example,

14  that if the claim were that Smith & Nephew made

15  misrepresentations about the safety of the R3 metal liner for

16  use with the R3 Acetabular System, that that claim could not be

17  preempted?

18       MR. O'QUINN:  If we agree with the Court, that if the

19  plaintiff could show specific facts demonstrating that we

20  violated federal law in the promotion of this device in such a

21  way as to mislead Dr. Terefenko to use it, that could

22  potentially be a non-preempted parallel claim.

23       THE COURT:  Okay.

24       Is your argument, essentially, that they have not

25  adequately pled a parallel claim, based on off-label promotion,

1    even in their second amended complaint?

2            MR. O'QUINN:  Absolutely, that's our argument.

3            And if the Court will permit me --

4            THE COURT:  Go ahead.

5            MR. O'QUINN:  -- if you go back to the first amended

6    complaint, you may recall that they wanted to depose Dr.

7    Terefenko and we had the discovery issue.

8            And part of our opposition to that was that Dr.

9    Terefenko -- there was no allegations that they had promoted off

10   label to him and the Court agreed with that.  And said, you're

11   right, I'm not letting you depose Dr. Terefenko, because they

12   haven't pleaded a claim for off-label promotion.

13           Be that as it may, if you go to the second amended

14   complaint which they say is necessary now that they've done all

15   of this discovery, there is not a single specific fact showing

16   any violation of any federal law that led Dr. Terefenko to use

17   this device.

18           Now, I can go through what they say real quickly, if

19   you'll let me, your Honor --

20           THE COURT:  Go ahead, I will.

21           MR. O'QUINN:  -- and there's four things.

22           First of all, they have a press release that

23   accompanied, the -- the release of the product and they seem to

24   say, well, it talked about its use in the R3 Acetabular System

25   and that's confusing and, therefore, it's off-label promotion.

1    Well, first of all, the FDA approved the name, R3 for

2    this component, okay.  So, I don't see how you can violate

3    federal law by calling it, the R3, when that's what the FDA

4    called it.

5    But, number two, that press release which was in their

6    original complaint, their first amended complaint and their

7    second amended complaint, discloses the regulatory status in the

8    second sentence and I attached it to the opposition, it says:

9    It was recently --

10    I'm paraphrasing.

11    -- but it was recently cleared for use with the BHR

12    resurfacing system.

13    The second sentence of the press release discloses the

14    regulatory status properly.  So, that's not a violation of

15    federal law.  And they don't allege that Dr. Terefenko even saw

16    it.

17    The second thing they do, is they attached the poly

18    label.  The question your Honor has about the package --

19    THE COURT:  Right.

20    MR. O'QUINN:  -- insert.  That's just wrong.  It's

21    wrong, it's the poly liner, the correct labeling is attached to

22    Mr. Rouse's affidavit.

23    And we gave Mr. Rouse's affidavit to them as part of

24    the discovery process that the Court allowed.  We probably

25    weren't obligated to, but we said, look, here's the affidavit

1  we're going to submit with our summary judgment.  They never

2  asked to depose him, they never came back and controverted it.

3       The un-controverted evidence in this record is that

4  the labeling attached to Mr. Rouse's declaration is the

5  labeling, period.

6       And this poly liner on its face doesn't say anything

7  about the metal liner, it's the poly liner.

8       So, that's the second thing, so that doesn't show a

9  claim.

10       They also say, separately, that the R -- that we

11  called it the R3 and that was misleading.  Well, the R3 -- the

12  FDA approved that name.  That's the FDA-approved name, the R3.

13       And then, finally, they cite an operative note from

14  Dr. Terefenko, where he talks about a metal-on-metal

15  articulation being appropriate for this patient.  That operative

16  note doesn't say anything about Smith & Nephew.  It doesn't say

17  anything about the liner.  It doesn't say anything about any

18  representations made to him.  It doesn't say anything about any

19  materials we gave him that misled him.  It just says, that he

20  was going to use a metal-on-metal system.

21       There were a bunch of metal-on-metal systems in the

22  market, we don't know why he decided to do that.  We don't know

23  how he came to that decision.

24       But what is clear is the plaintiffs' complaint does

25  not allege any specific facts showing that Smith & Nephew

1    violated federal law and induced this doctor to use it.

2         On the other side of the coin, the labeling -- the

3    FDA-approved labeling attached to Mr. Rouse's declaration says,

4    twice, that it's only approved with a resurfacing component, it

5    says, this is the liner for the BHR resurfacing system and, oh,

6    by the way, Doctor, the only cleared femoral component is the

7    resurfacing component.  And I've cited that to your Honor in the

8    briefs several times, it's attached to the materials we've

9    submitted.  So, that's it.

10        They're saying, Court, let us have another bite at the

11   apple, because we've got these facts that show that we promoted

12   off label.  But the specific things they point to don't show

13   that.

14        I'd also like to add, your Honor, we do agree that in

15   appropriate circumstances an off-label promotion claim could go

16   forward, but there's not one here, that's, basically, our

17   position.

18        And that law shows you why their other arguments are

19   wrong.  They're saying that if the FDA approved it as a system

20   and the doctor took it off the shelf and used it some other way,

21   then that approval goes away somehow.  But how can that be?  We

22   don't know how the doctor is going to use it when we put it on

23   the market.  We -- you know -- our obligation is not to

24   fraudulently make him use it off label.  So, the FDA can't

25   regulate that ultimate use.

1    What it does regulate and what the cases that I've

2  cited to your Honor about the _Ramirez_ case, particularly, say

3  is, the manufacturer can't violate federal law in promoting the

4  project -- product -- to the doctor.  If he does that, you don't

5  get preemption.

6    Now, we disagree on the scope of that, but that fits

7  in perfectly with the overall regulatory system, you'd go to the

8  FDA, you'd get your clearance.  The FDA tells you how to label

9  it.  You put it out in the world.

10    If doctors begin to use it off label, we're not

11  responsible for that, unless we've violated federal law in the

12  way to get them to use it that way.  And there are not specific

13  allegations on that.

14    THE COURT:  Well, they -- in their amended complaint

15  and in the first complaint, they've -- on the parallel claim --

16  they brought a whole bunch of violations of federal law.  One of

17  the problems was in getting -- connecting the dots and showing

18  how those violations led to the injury.

19    Does the amended complaint change analysis on the

20  parallel claim?

21    MR. O'QUINN:  It does not, your Honor, because of two

22  reasons:

23    They did cite a lot of federal law.  And if you'd look

24  at some of the specific things they've cited, it's -- it's all

25  along the lines of Smith & Nephew violated CFR such and such and

1   CFR such and such in failing to properly label the device.

2          Smith & Nephew violated CFR such and such and such and

3   such in improperly distributing the device or improperly

4   manufacturing the device.

5          There are not specific facts in both the first amended

6   complaint and the second amended complaint, they just went to

7   the Code of Federal Regulations and they paraphrased the

8   elements of some kind of violation and said, aha, we've pled a

9   parallel claim.  The case law resounding rejects that.

10         I mean, if you'd look at the specific facts, where are

11  the specific facts that show that we violated federal law and as

12  a result of that violation, Mr. Shuker did not get the liner as

13  approved by the FDA or the labeling approved by the FDA?

14  There's no specific facts.

15         What they point to in their motion to amend are things

16  that clearly don't do that, the poly liner, a press release that

17  discloses the regulatory status, an operative note the doesn't

18  say anything about anything, that's their evidence, your Honor,

19  and that doesn't plausibly show an off-label promotion claim.

20         THE COURT:  Very well.

21         Anything else with regards to your arguments?

22         MR. O'QUINN:  Thank you for the opportunity, your

23  Honor and let me just see if there's --

24         (Pause at 2:34 p.m.)

25         MR. O'QUINN:  Your Honor, we've briefed this several

1    times.  Your Honor's questions show to me that you're on top of

2    it.  If anything comes to you while we're going through this

3    process, I am glad to be here and appreciate the Court's

4    attention and the opportunity to answer anything you have, just

5    let me know what else, you may want to --

6              THE COURT:  Very well.

7              I'll give you an opportunity for rebuttal after I hear

8    from the plaintiff.

9              MR. O'QUINN:  Thank you, your Honor.

10             (Pause and whispering held off the record.)

11             THE COURT:  Mr. Zajac, I want to talk about the use of

12   the metal liner and the -- with the metal femoral head, okay?

13             MR. ZAJAC:  Right.

14             THE COURT:  And my question to you is the following:

15             Is it correct -- or is it a correct interpretation or

16   reading of your complaint, that Mr. Shuker's injuries were

17   caused by the metal-on-metal articulation as reflected in the

18   notes of the components used in the hip replacement --

19   replacement?

20             MR. ZAJAC:  I -- I believe that it is an overly-

21   narrow, unreasonable interpretation of the complaint to say

22   that, the defect is limited to the metal liner.  I don't know if

23   that answers your question.

24             THE COURT:  Well, we have the cup and we have the

25   metal liner and they were rubbing, right?

1      MR. ZAJAC:  Correct.

2      THE COURT:  And that's what caused the injury, if any

3 that he had, right?

4      MR. ZAJAC:  That's what caused -- probably, caused the

5 metal-on-metal release.

6      THE COURT:  Isn't that what caused the problem?

7      MR. ZAJAC:  There are -- there are multiple problems,

8 that caused one of the problems, based on the limited record we

9 have available and that is the operative report from removing

10 the materials, is that those two items --

11      THE COURT:  Well, hold on a minute -- hold one a

12 minute.

13      MR. ZAJAC:  Yes.

14      THE COURT:  I just asked you a simple question, your

15 answer is that my interpretation of your complaint is too broad

16 or too narrow, right?

17      MR. ZAJAC:  In that limited respect, yes.

18      THE COURT:  All right.

19      Do you have any claims that the hip-replacement system

20 that he received was defective or unsafe, independent of the

21 metal liner?

22      MR. ZAJAC:  Yes.

23      THE COURT:  Independent of the metal liner?

24      MR. ZAJAC:  With respect to warnings, I believe so,

25 yes.

1        THE COURT:  In other words, are there any claims in

2   your complaint that don't depend in some way on the metal liner

3   -- on the metal liner?

4        MR. ZAJAC:  The metal liner is, clearly, a part of it.

5        THE COURT:  It's the central part of your case, isn't

6   it?

7        MR. ZAJAC:  No.

8        THE COURT:  Okay.

9        MR. ZAJAC:  Okay.  Let me --

10        THE COURT:  Go ahead.

11        MR. ZAJAC:  -- and let me ex --

12        THE COURT:  What's your argument?

13        MR. ZAJAC:  -- let me also say this, that even if it

14   were -- let's assume for argument purposes that --

15        THE COURT:  You admit that the metal liner had pre-

16   market approval, we go that far, right, your initial argument

17   before was of -- right?

18        MR. ZAJAC:  It had qualified approval and that's

19   really super important.

20        THE COURT:  A qualified approval?

21        MR. ZAJAC:  Yes.

22        Because when the FDA approves a component part, okay,

23   it always does so in the context of the hip system that it's

24   part of.

25        THE COURT:  Qualified.

1          You're just seem to be shifting your -- be shifting

2    your argument from the motion to dismiss to now -- to your brief

3    to now qualified approval.

4          MR. ZAJAC:  I --

5          THE COURT:  Did it get pre-market approval or not?

6          MR. ZAJAC:  It got pre-market approval as a component

7    for use in the BHR with BHR femoral components.  It did not get

8    PMA approval.

9          THE COURT:  Where do you get that, what -- where --

10   where did you get that --

11         MR. ZAJAC:  From the P --

12         THE COURT:  -- is that --

13         MR. ZAJAC:  -- from the PMA record for -- for the --

14   for the --

15         THE COURT:  Tell me where -- where does it say that

16   they got qualified approval, that it could only be used -- what

17   I understand you are saying is, it could only be used with the

18   BHR System, right?

19         MR. ZAJAC:  Okay.  All right.

20         THE COURT:  Is -- is that your argument, is that --

21         MR. ZAJAC:  Absolutely.

22         THE COURT:  -- what -- am I understanding it

23   correctly --

24         MR. ZAJAC:  Absolutely.

25         THE COURT:  -- that it could only be used with -- with

1   that system?

2           MR. ZAJAC:  Absolutely -- absolutely.

3           I apologize for turning my back on you, I will have to

4   go back and get my binder.

5           THE COURT:  Okay, go ahead.

6           MR. ZAJAC:  Okay.

7           (Pause at 2:38 p.m.)

8           MR. ZAJAC:  Now, let -- let me just point to,

9   generally, there is a section in my brief that cites to various

10  Bates numbers, okay, that were produced by Smith & Nephew, where

11  Smith & Nephew when it applied for the BHR supplement for the

12  metal liner, it specifically said, we're not changing the

13  articulation with the femoral heads.  Okay.

14          They went to great lengths to represent to the FDA, we

15  are not changing the articulation with the femoral components.

16  The BHA has its own special femoral components and we -- we cite

17  what they are in our brief when we cite to the Bates numbers.

18          And when Smith & Nephew applied for the supplement it

19  said, we're going to be using the same femoral components, no

20  other femoral components and, therefore, there's no -- no change

21  in safety or effectiveness.

22          If you want to, I can try to go back and find my

23  brief, where I cite to those Bates numbers.  We know from -- we

24  know from Bates No. 12535, that the FDA reviews hip systems and

25  not individual components.

1      THE COURT:  All right.

2      MR. ZAJAC:  And when it does so, it wants the

3  manufacturer to identify the entire system of components under

4  review for that system.

5      THE COURT:  Okay.  So --

6      MR. ZAJAC:  Okay?

7      THE COURT:  -- so, let me see if I understand, maybe

8  -- maybe -- I think this goes to your argument that I should

9  look for purposes of the preemption analysis at the device as a

10  whole and not at the component parts in conducting my -- my

11  analysis, right?

12      MR. ZAJAC:  Correct.

13      THE COURT:  You also seem to be arguing that the

14  device at issue in this case is the Class 2 5K clear system,

15  right?

16      MR. ZAJAC:  Correct.

17      THE COURT:  But isn't it true that the FDA has never

18  approved the 5K review or pre-market approval process, the

19  particular device used in his surgery?

20      MR. ZAJAC:  In that particular assemblage, correct, it

21  did not --

22      THE COURT:  Right.

23      MR. ZAJAC:  -- and that has important implications for

24  preemption.

25      THE COURT:  And doesn't this fact, that the precise

1    combination of components used in Mr. Shuker's surgery had not

2    been approved, distinguish this case from the cases cited in

3    your brief, regarding 5K clear components that are later

4    incorporated into a device that receives pre-market approval, it

5    makes a big distinction, doesn't it?

6        MR. ZAJAC:  I -- I disagree that it does and let me

7    explain, okay?

8        THE COURT:  Okay.

9        MR. ZAJAC:  The particular assemblage of components

10   here, is not part of a true device that has been reviewed by the

11   FDA in that particular assemblage, right, we -- I think we can

12   agree that the FDA never looked at this particular use of

13   components and said, we will give this our blessings, it's fine.

14       The -- the FDA -- the regulatory system has a default

15   and the default is this, if you have a -- if you have a hip

16   system that has not undergone any specific review, it is by

17   default a Class 3.  However, it's not Class 3 that invokes

18   preemption, it's MDA approval that invokes preemption, okay.

19       So, what you have is a Class 3 device by default that

20   has never been MDA approved.

21       And if you look at Section 360 and all the cases that

22   talk about preemption, the idea behind preemption is that the

23   manufacturer got approval, you -- you submitted -- you submitted

24   the -- you identified all the component parts, you identified --

25   you sent in all your studies, you answered all of the questions,

1  you went through all the clinical trials and the FDA said, you

2  can go ahead and sell.  That's what entitles you to preemption,

3  not just being a Class 3 device.

4          In fact, part of what we allege --

5          THE COURT:  To get to be a Class 3 device, so you have

6  FDA approval, is part -- one of the most vigorous processes that

7  you have to go through to get that -- that classification,

8  right?

9          MR. ZAJAC:  I'd -- in a word, no, because if you do

10  not get -- if you do not get MDA approval, you are considered

11  Class 3 by default, all right.

12          In other words, you have -- you have sold something

13  that has never undergone the rigorous review, that makes it

14  Class 3.

15          What that does importantly, is it invokes the

16  requirement -- any manufacturer selling a Class 3 system -- has

17  to get MDA approval and identify all the component parts.  It's

18  a distinction with a difference.  Okay.

19          So, the end -- the end result is the same here and

20  that is that they're not entitled to preemption.

21          So, either -- either, it's a Class 2 510K cleared

22  system with a single component part from another Class 3, PMA

23  approved system or it's not really a system at all, it's by

24  default, Class 3, but it's Class 3 not PMA approved, so it's not

25  entitled to preemption.

1          THE COURT:  Very well.

2          So, you're saying although the metal liner in this

3     case was approved as part of the -- of the BH -- BHR resurfacing

4     system, that -- that that device was approved, not necessarily,

5     the component part and when you use it with the R3 Acetabular

6     System, that is a Class -- that becomes a Class 2 device?

7          MR. ZAJAC:  I -- I don't think that you can change the

8     Class 2 status of the R3 Acetabular System. just by taking the

9     metal liner and using it with it, that -- that in fact, there

10    incredible policy considerations there.

11         THE COURT:  But you agree that the R3 metal liner

12    received pre-market approval?

13         MR. ZAJAC:  For use with the BHR with BHR femoral

14    components.

15         THE COURT:  But it is a component part of the BHR

16    System that got pre-market approval?

17         MR. ZAJAC:  For that use, yes.

18         THE COURT:  It had -- it had a package and it had

19    instructions to be used by itself, didn't it?

20         MR. ZAJAC:  Let's talk about the -- the packaging

21    instructions, because I think there has been a lot of confusion

22    about that, okay.

23         Let's talk about the surgical technique documents that

24    have been referenced.  And there is a surgical technique

25    document --

1          THE COURT:  So, it did not have any warnings that the

2   component part, itself, had no packaging or warning that any

3   physician would be able to access and read it?

4          MR. ZAJAC:  The liner did.

5          THE COURT:  All right.

6          MR. ZAJAC:  The -- the --

7          THE COURT:  As pre -- as it had -- as consistent with

8   the pre-market approval?

9          MR. ZAJAC:  Correct.

10          THE COURT:  Okay.

11          MR. ZAJAC:  Correct.

12          Now --

13          THE COURT:  So, what's the problem with that?

14          MR. ZAJAC:  Okay.

15          There's -- there's many problems with that.

16          Number one, okay --

17          THE COURT:  It tells people how to use it, right, it

18   tells doctors how to use that device, that metal liner --

19          MR. ZAJAC:  They're --

20          THE COURT:  -- which is a component part of the BHR --

21   the BHR System, right?

22          MR. ZAJAC:  Yes.  Okay.

23          It -- it's -- but they're -- they're doing one thing

24   with their left hand and doing another thing with their right

25   hand.

1      With their left hand, they're giving you a little

2  insert with the liner that says, this is approved for use with

3  the -- with the BHR.  Okay.

4      And then, on the other hand, they're encouraging the

5  doctors to go off label.

6      THE COURT:  How?  What facts do you have, that they

7  are doing that --

8      MR. ZAJAC:  Okay.

9      THE COURT:  -- other than they're making the product?

10     MR. ZAJAC:  Considering, I haven't had discovery on

11  that, I have a pretty good set of facts and I --

12     THE COURT:  Okay.

13     MR. ZAJAC:  -- and I'd point out we have only had

14  discovery on the regulatory status of the device, not on its

15  marketing and distribution.

16     So, your Honor, please understand, I'm only going by

17  what I have inferentially and from indirect sources.  I have not

18  had discovery on this.

19     But here's -- here's what -- you know -- here's what

20  we know.

21     We know that, first of all, they called it the R3

22  metal liner, all right, they didn't call it the BHR metal liner,

23  they --

24     THE COURT:  They said, FDA called it the R3 metal

25  liner.

1      MR. ZAJAC:  Absolutely wrong.  The FDA does not

2  approve names, okay, that is -- that is such a mis-directional

3  argument.

4      The FDA doesn't say, we are allowing you to call this

5  the R3 metal liner, because we think it's okay to call it that.

6  They do not regulate the name.  Okay.  So, that's number one.

7      We -- we know, in fact, that the FDA has specifically

8  told us in response to a subpoena, that it was never -- they

9  didn't even know it was called the R3 metal liner, it was never

10  approved for use with the R3 Acetabular System.  So, they call

11  it that.

12      As soon as -- as soon as the -- the metal liner was

13  approved through the supplement to the BHR, almost immediately,

14  Smith & Nephew goes out and tells all the doctors, we now have

15  this optional metal liner and they -- they call it the RD

16  Acetabular System optional metal liner.  All right.  That's what

17  they call it all over the place.  Okay.

18      And they have these surgical --

19      THE COURT:  I --

20      MR. ZAJAC:  -- techniques -- these surgical-technique

21  documents and these are Bates Nos. 13167 onward, is the one for

22  the R3 system.  These surgical-technique brochures, your Honor,

23  are not for the liners, they're for the procedures.  Okay.

24  They're for the procedures.

25      The -- the one that begins at 13167 goes through and

1  explains the entire procedure for the R3 hip replacement, okay.

2  The -- the liner is not on this first page, you see, the first

3  page here, if I could direct you back to the beginning.

4          THE COURT:  I have it.

5          MR. ZAJAC:  It -- it does say, poly, but it doesn't

6  use the word, liner and the picture is not of the liner, it's of

7  the shell.

8          THE COURT:  Right.

9          MR. ZAJAC:  All right.

10          And then, you go through and any reasonable reading of

11  this pro --

12          THE COURT:  They -- they argue, you're wrong, that

13  this is not pertaining to the metal -- the R3 metal liner.

14          MR. ZAJAC:  Well, they argue a lot of things that are

15  inconsistent with -- with the record and things that they say in

16  other documents and this is one of them, because nowhere --

17          THE COURT:  It says, poly, right, it doesn't say,

18  metal liner?

19          MR. ZAJAC:  They've used the word, poly, but it

20  doesn't say, a liner.

21          THE COURT:  All right.

22          MR. ZAJAC:  And it's -- and it's a picture of the

23  shell and -- and it says, surgical technique, no hole, three

24  hole, multi-hole, pre-operative planning, short technique, it

25  goes through shell and liner offerings, it goes on and on and

1  on.  It doesn't say that it's specific to the liner.

2          And here's to the point of your Honor -- your Honor is

3  asking a question about, well, what about the components that

4  are not part of the PMA approval, what about these other R3

5  parts?

6          There's nothing in here that says, you cannot use the

7  metal liner in this procedure.  In fact, the language is

8  ambiguous.

9          On Page 9 of the document, itself, where it gets into

10  the R3 Acetabular liner insertion, it uses -- the terms, XLPE,

11  it uses the term R3 Acetabular liner.  It's not -- there's

12  nothing in here that says, you can't use the metal liner for

13  this procedure.

14          And then, you go back to the other surgical-technique

15  document that they're relied upon, that this one (indicating).

16          THE COURT:  All right.

17          MR. ZAJAC:  And they -- I'm sorry.

18          THE COURT:  That's the --

19          UNIDENTIFIED COUNSEL:  Thank you.

20          THE COURT:  -- that's the (indiscernible) and the hip,

21  right?

22          MR. ZAJAC:  Right.

23          This is the one that says --

24          THE COURT:  These are two different things, are they

25  not?

1       MR. ZAJAC:  That's my point.  My point is --

2       THE COURT:  Go ahead.

3       MR. ZAJAC:  -- they're very different things, because

4  the -- Smith & Nephew's counsel cites to this and says, this

5  says:

6       Don't use the metal liner with the -- with anything

7     else, other than BHR.

8       But Dr. Terefenko, why would he be looking at this, if

9  he's doing -- he's not doing a BHR.  Okay.

10      So, they point to this and they say, your Honor, it

11  says right in here, you know, you're -- you're not supposed to

12  use this for anything, other than -- ah -- than the BHR.

13      And it says in here that:

14      In the U.S., the metal liner is intended for use

15     as part of use as part of the BHR system only.

16      Okay, great.  But Dr. Terefenko is not putting in a

17  BHR, he's doing a hip replacement.

18      So, if he's looking at anything, he's looking at the

19  first one I gave you and there's nothing in there that says, oh,

20  you'd better not use -- you'd better not use the metal liner,

21  you can only use the poly liner.  Okay.

22      So, let's -- let's try to -- you know -- let's try to

23  clarify that.  Okay.

24      I have -- I have a few other points that I'd like to

25  make here.

1   There were a lot of remarks about the declarations

2   that were made by the Smith & Nephew folks.  Those declarations

3   were served almost at the very end of the discovery period.  I

4   had no opportunity to depose them.  It's not like they were

5   given early on and then, I decided, I didn't want to depose

6   them, they -- they were given three or four days before the

7   discovery-end date.  And a lot of representations were made that

8   I could have deposed them.  I had no reasonable opportunity to

9   do so.

10  THE COURT:  The fact that they filed an affidavit in

11  support of their motion, even if you had deposed them and you

12  didn't review the questions that were relevant, they had the

13  opportunity to file an affidavit in -- in support of the motion

14  for summary judgment and you had an opportunity to submit a

15  counter affidavit, right?

16  MR. ZAJAC:  Ah, I'm not sure from whom I would be able

17  to submit a counter affidavit.

18  THE COURT:  Very well.

19  MR. ZAJAC:  I -- I did try to take Dr. Terefenko's

20  deposition.

21  Okay, let me --

22  THE COURT:  Okay.

23  MR. ZAJAC:  -- let me go back to some of these points

24  about --

25  (Pause at 2:53 p.m.)

1        MR. ZAJAC:  Okay.

2        You asked the question, your Honor, what exactly is

3 the device?

4        THE COURT:  Correct.

5        MR. ZAJAC:  We have submitted the information from the

6 FDA, itself, directly that says:

7        We review systems, not individual components.

8        That's Bates No. 12535.  Okay.  Why is --

9        THE COURT:  So, what is the system --

10       MR. ZAJAC:  The system --

11       THE COURT:  -- according to you, that caused the

12 injury?

13       MR. ZAJAC:  It is an R3 Acetabular system that is

14 using an R3 metal liner, but that does not allow preemption,

15 simply because the R3 metal liner was used.

16       I -- obviously, the R3 metal liner was used and the R3

17 metal liner is from the BHR, which was PMA approved.

18       THE COURT:  Which is a component part of the BHR --

19 the Birmingham Hip Re -- Resurfacing which got pre-market

20 approval.

21       MR. ZAJAC:  Correct.

22       So, let's -- let's --

23       THE COURT:  And the -- and the component part, you

24 will agree got pre-market approval?

25       MR. ZAJAC:  For the BHR, yes.

1          THE COURT:  All right.

2          MR. ZAJAC:   Let's -- let's talk about the policy

3    argument, I made before.  Okay.

4          What is the defendant asking the Court to do?  We

5    have --

6          THE COURT:  See, you're -- you don't have -- it seems

7    to me that -- and I get back to this -- this whole question --

8    you don't have an independent claim from the metal liner, you

9    don't -- you don't -- standing on its own, somehow, the metal

10   liner is connected or interconnected with the Acetabular System,

11   that you have the R3 Acetabular System that -- that was used.

12   It's not independent, it's part --

13         MR. ZAJAC:  It --

14         THE COURT:  -- of whatever -- whatever occurred,

15   'cause it was metal on metal, you cannot stand on your own, it's

16   not an independent claim which you -- which, I think, they

17   agree, it would have been preempted.

18         MR. ZAJAC:  Well, yeah -- yeah, but let's talk about

19   that.

20         I agree, your Honor, you can't have metal-on-metal

21   debris, unless you have the metal liner in contact with other

22   metal, okay.  Correct.

23         But, please, consider this, if there's any point you

24   take away from this argument today, it is that that particular

25   metal-on-metal articulation with the -- with the BHR metal liner

1  with the R3 femoral components, it was never looked at by the

2  FDA.  They're different femoral components.

3          THE COURT:  You're not -- you're not complaining the

4  R3 Acetabular System by itself was the problem, right?

5          MR. ZAJAC:  In and of itself without there being a

6  metal-on-metal liner, correct.

7          THE COURT:  Okay.

8          MR. ZAJAC:  But my -- but my point is, it doesn't --

9  here's -- here again, is my policy point, okay.  You have -- I

10  think we agree we -- we have an otherwise, 510K cleared system,

11  if we'd take the metal liner out, right and we use a poly liner,

12  then everything is 510K cleared.  I think we all agree with

13  that.  The system is 510K cleared, it's all -- it's all 510K,

14  which means there's no preemption, right?

15          Think of the policy position here.  If you can -- if

16  you were a manufacturer, like, Smith & Nephew and you have a

17  component from a different system which has been vigorously

18  studied and reviewed that has different metal-on-metal

19  articulations between Acetabular and femoral and you pull that

20  out and you stick it in a Class 2 510K cleared system, you have

21  just turned that 510K cleared -- 10 -- I'm sorry.  You've just

22  turned 510K cleared system into a PMA approved system.

23          You've completely circumvented the whole point of

24  getting PMA approval -- completely.  That's the next step of

25  this -- that's the next step, you've completely undermined the

1    entire PMA approval process.

2          THE COURT:  But the system that you've got -- got,

3    neither, 5K -- no pre-market approval, right, neither one?

4          MR. ZAJAC:  Correct.

5          THE COURT:  Right.

6          MR. ZAJAC:  So, it's --

7          THE COURT:  Doesn't --

8          MR. ZAJAC:  Yeah.

9          THE COURT:  -- that -- the fact that it was using a

10   combination of -- those two component parts were using a

11   combination in the surgery that had not been approved,

12   distinguish the situation here from the cases you've cited in

13   which 5K cleared components are later incorporated into the

14   device that received pre-market approval?

15         MR. ZAJAC:  In that -- that -- that is a way to look

16   at it, yes.

17         THE COURT:  Okay.

18         MR. ZAJAC:  But again, under the scheme, that makes it

19   Class 3, but not PMA approved and because it's not PMA approved,

20   you don't get preemption.

21         THE COURT:  Okay.

22         MR. ZAJAC:  So, you still land with no preemption

23   under that analysis.

24         THE COURT:  Very well.

25         Assume for a minute that Smith & Nephew did not

1    promote the R3 metal liner for use with the RE Acetabular

2    System, but merely had the metal liner on the market for use in

3    the BHR System, make those assumptions.

4         If that were the case, why shouldn't the company get

5    the benefit of preemption, when a doctor decides to put the

6    metal liner off label used with the R3 Acetabular System?

7         MR. ZAJAC:  If -- if -- if the manu -- right.

8         THE COURT:  In other words, shouldn't the device make

9    or get the benefit of preemption, so long as it is only

10   promoting its device for users approved by the FDA?

11        MR. ZAJAC:  Under -- under that limited factual

12   scenario, which I don't believe we had, I would pack up my bags

13   and go home.

14        THE COURT:  Okay.

15        Why not -- why don't you think you have those limited

16   circumstances here?

17        MR. ZAJAC:  Well, because we know based on a rather

18   limited record, that through the press releases that are -- that

19   are in the record -- and I apologize, I can't quote them

20   verbatim -- okay -- that once -- once the metal liner was

21   approved, a press release was issued by Smith & Nephew, either,

22   directly or indirectly, encouraging surgeons, like, Dr.

23   Terefenko to use that metal liner in the R3 System.

24        We -- okay -- we know -- we know that it was being

25   called the R3 metal liner.  We know inferentially from the

1  recall notice, it has language in it that is a clear concession

2  that Smith & Nephew has been putting this product out there, as

3  if it's part of the R3 System.

4      And if you want me to quote that, I can find that, but

5  it's pretty -- and excuse me for saying this -- pretty damning

6  language that indicates that Smith & Nephew is -- is regarding

7  this device as part of the R3 System.  Otherwise, it's hard to

8  imagine, how they worded the recall notice the way they did.

9      THE COURT:  All right.

10     MR. ZAJAC:  That's some of it and again, this is

11 without the benefit of formal discovery and this will -- I think

12 -- brings us back to the Cullen (ph) case.

13     I can't possibly prove my entire case in my complaint.

14 If your Honor wants that degree of factual specificity, I'd be

15 happy to provide it in a pretrial memo.

16     THE COURT:  Very well.

17     Let me -- let me move on then.

18     To the extent that they are claiming that the R3 metal

19 liner was negligent -- negligent or defectively designed --

20 doesn't the fact that it was PMA approved or received approval

21 as part of the BHR System, prevent the company from changing the

22 design of the R3 metal liner which is part of the BHR System?

23     MR. ZAJAC:  No.  In fact what you're supposed to do if

24 you're Smith & Nephew, if you're --

25     THE COURT:  No?  You have -- you're not -- you're not

1   prevented from -- from changing the design or adding to the

2   design --

3           MR. ZAJAC:  Not -- you -- you have --

4           THE COURT:  -- without -- without FDA approval?

5           MR. ZAJAC:  You have to go back to the FDA and say,

6   FDA, I want -- I want doctors to use this metal liner with the

7   R3 Acetabular System, let me show you why it's safe and

8   effective to do so.  That's what you are supposed to do under

9   the regulatory scheme.

10          And that's what I refer to as the inconvenient truth

11  in my brief, about why the defendant continues to glob on to the

12  fact that the liner, itself, was PMA approved.

13          Because the regulatory scheme says, you really are

14  supposed to be going back and telling the FDA that this is being

15  used for a purpose -- for different femoral components, because

16  you told the FDA when you submitted this for approval that you

17  were -- that there was going to be no change in the femoral

18  components, that they were going to be exactly the same as they

19  were before.  And we know that they are, in fact, different.

20  And we know that it's at that juncture, that Dr. Terefenko found

21  significant metal debris.

22          THE COURT:  Very well.

23          In your complaint, you brought certain claims for a

24  breach of expressed warranty in which you are claiming that the

25  defendants expressly warranted that the R3 Acetabular System and

1    the components, which is the R3 metal liner, foreseeably, would

2    be used when it was safe and/or well accepted by users.

3            And my question is, is it a correct reading of your

4    complaint that you are not alleging that the defendants

5    expressly warranted that the R3 Acetabular System was safe for

6    use with the R3 metal liner, you're not claiming that, right --

7            MR. ZAJAC:  The --

8            THE COURT:  -- you are not --

9            MR. ZAJAC:  -- they didn't expressly --

10           THE COURT:  -- claiming --

11           MR. ZAJAC:  -- use those words.

12           THE COURT:  Hold on a minute.

13           MR. ZAJAC:  All right.

14           THE COURT:  You are not claiming that the defendants

15   expressly warranted in any way, shape or form, that the R3

16   Acetabular System was safe for use in conjunction with the R3

17   metal liner?

18           MR. ZAJAC:  In a breach of warranty context, that's --

19   that's correct.

20           THE COURT:  Okay.

21           Well, let's move on to the preemption.  If you -- if

22   you have anything else to add -- to add to the off-label

23   promotion, if you have any things to add to the preemption

24   argument, are you done?

25           MR. ZAJAC:  Let me -- if I can just take a moment to

1    look at my notes, I believe, I am but I just wanted to be sure.

2           (Pause at 3:03 p.m.)

3           MR. ZAJAC:  I just have one final thought on that and

4    I -- I promise I -- we can move on to the next issue.

5           I cite the <u>Regal</u> case, the U.S. Supreme Court case in

6    my brief as to why defendant manufacturers get the benefit of

7    preemption and -- and the whole principle behind it, is because

8    the device, its components were tested and vetted and analyzed

9    and found safe.

10          I am not asking the Court to find this product or

11   device be made safe for any -- in any way different from or in

12   addition to what the FDA looked at when it approved this liner.

13          THE COURT:  Right.

14          MR. ZAJAC:  It approved this liner with a very

15   specific set of femoral components, not the set of femoral

16   components that was used.

17          Okay, off label --

18          THE COURT:  All right.

19          So, help me out here in -- and I want to focus on the

20   off-label promotion and then I want to focus on Count 2 and your

21   amended complaint.

22          First of all, if I conclude the preemption applies

23   because the R3 metal liner received pre-market approval.

24          And further, if I conclude or decline to follow

25   <u>Ramirez</u> which has been heavily criticized and not even followed

1    in its own district court, such that you are limited to a

2    parallel claim, based on off-label promotions -- so, I'd make

3    those assumptions -- what is your parallel claim based on

4    promotion of label uses, what is it, factually?  What is your

5    theory -- factual and legal theory -- with regards to your claim

6    as to promotion of off-label uses?

7            MR. ZAJAC:  Okay.

8            Well, I'm just finding where this is in my proposed

9    second amended complaint.

10           (Pause 3:05 p.m.)

11           MR. ZAJAC:  And Count 2 is Paragraphs 126 onward.

12           THE COURT:  In other words, what I want to get at is

13   -- because you went through twenty pages in your second amended

14   complaint.  But what I want to get at is for you to very

15   succinctly tell me, what -- what is the factual basis for your

16   claim that Smith & Nephew promoted the R3 metal liner for use

17   with the R3 Acetabular System to doctors in the United States?

18           And what theories are you pursuing with respect to

19   off-label promotion?

20           MR. ZAJAC:  Okay.

21           THE COURT:  In other words --

22           MR. ZAJAC:  Right.

23           THE COURT:  -- give me the meat or your factual and

24   legal theory.

25           MR. ZAJAC:  Right.

1    Here's the gist of it then.  After the R3 metal liner

2  was approved with the BHR, Smith & Nephew issued a press

3  release, okay, communicating to physicians like Dr. Terefenko,

4  that you now have this metal liner to use as an option with the

5  R3 Acetabular System.  Okay.  And it touted various benefits of

6  using the R3 metal liner as part of the R -- as part of the

7  Acetabular System, including for patients who were more active.

8    Mr. Shuker was a more active patient, more elderly but

9  he was very, very active.  In fact, he has a -- a gym in his own

10  home that he worked out at.

11    And Dr. Terefenko was very aware of Mr. Shuker's

12  relative -- relatively -- impressive level of activity at his

13  age.

14    THE COURT:  Seventy, I guess, is a young age --

15    MR. ZAJAC:  Well, it --

16    THE COURT:  -- or --

17    MR. ZAJAC:  -- sure.  Seventy is the --

18    THE COURT:  I'm glad to hear that.

19    MR. ZAJAC:  -- new sixty.

20    (Laughter at 3:06 p.m.)

21    MR. ZAJAC:  And did not -- did not -- give any

22  information about how that particular articulation of the metal

23  liner with the R3 femoral components, it was never part of what

24  the FDA approved for that metal liner, never studied or

25  evaluated and said, this is a great option for you and your --

1    and patients like Mr. Shuker.  Okay.

2          Now, do we know what was in Dr. Terefenko's head?  No,

3    we don't.  Someday, I hope I'll get to depose him and ask him.

4          So, Dr. -- so, Dr. Terefenko without knowing that this

5    particular articulation has never been clinically studied or

6    evaluated, goes ahead and agrees to do it.

7          And lo and behold, some months later, Mr. Shuker

8    begins to develop a pain in his hip, that they think is, maybe,

9    one thing or another thing.

10         But one of the last things that they suspected is --

11   is metal sensitivity.

12         They eventually draw out some fluid, they put it under

13   a microscope and they say, you know what, this is actually metal

14   sensitivity.  You've got metal on metal in there, we're going to

15   have to take the whole thing out.

16         And when Dr. Terefenko takes it out, he finds, lo and

17   behold, a lot of metal debris right at that junction between the

18   metal liner and the R3 femoral heads.  Okay.

19         That is the gist of it, we know that it's being

20   called, the R3 metal liner.  We know that the -- the surgical

21   technique brochure that goes out, doesn't say anything about,

22   don't use the metal liner.  It goes through and explains the

23   entire surgical technique for the whole procedure.

24         We know that the inserts to those R3 femoral

25   components don't say anything about, guess what, Doctors, don't

1   pair this with an R3 metal liner, don't do that.

2       There's no -- there's no FDA regulation of that,

3   because those R3 femoral components are 510K cleared.  So, the

4   FDA has never PMA approved any of that.

5       So, basically, the gist of it is, they allowed doctors

6   to think and encouraged them to think, this is a great option

7   for them to use.  The doctor uses it.  We end up with -- with a

8   metal-on-metal problem.

9       THE COURT:  Okay.

10      MR. ZAJAC:  I could drill down -- I mean, this goes on

11   for page after page after page, where we say that things would

12   have played out differently.  I mean, I -- because four or five

13   pages -- we do the best we can based on what we know at this

14   point, your Honor.

15      THE COURT:  Very well.

16      MR. ZAJAC:  Based on what he know, we put it together

17   as best we can and this -- this goes back to the Cullen case.  I

18   understand your Honor permitted discovery, but you've permitted

19   discovery only on the issue of what the classification status

20   was, not -- not what, they specifically represented to doctors.

21      I -- I couldn't take Dr. Terefenko's deposition and

22   say, you tell me, Doctor, what did they -- what did they -- what

23   did Smith & Nephew tell you about the use of the metal liner?

24      That's -- that's what discovery is for and I think,

25   the Cullen case from the Western District recognizes that.

1    There are practical considerations here.  I can't prove the

2    entire case at this point.

3              THE COURT:  Very well.

4              Let me try a similar question with regards to your

5    parallel claim.  Count 2, it appears to me of your first and the

6    second amended complaint, it appears to me is the claim based on

7    negligence based on violations of federal law and regulations.

8              And it seems to me, it is the count dealing with the

9    parallel claim, am I correct, Count 2 --

10             MR. ZAJAC:  The point of Count 2 is --

11             THE COURT:  -- Count 2 --

12             MR. ZAJAC:  -- to articulate parallel claims, should

13   the Court find preemption.

14             THE COURT:  Okay.

15             Now, it took you ten -- twenty -- pages in your second

16   amended complaint to sort of lay it out.

17             And what I want you to do is -- as succinctly as you

18   can -- and not by -- you know -- with -- with as many facts as

19   you can that support your theory of parallel claim to tell me --

20   very succinctly -- not to throw regulations for me to read, the

21   regu -- the Federal Safety standards.

22             But what Federal Safety standards, you believe, he --

23   he violated and you've listed them.  But I think more

24   importantly, how those violations, you believe, caused the

25   injury -- the violation of those things caused the injury?

1          Because just giving me the code is -- it's not enough.

2          MR. ZAJAC:  Okay.

3          Well, I don't know what else to tell you with this

4    limited record, other than to tell you that Dr. Terefenko and/or

5    my client would have known that this was an untested, un-vetted

6    combination of parts articulating with each other.

7          They were already at that point, there was -- it was

8    bubbling to the surface, that metal-on-metal articulations had a

9    problem.

10          And that had Dr. Terefenko known, had my client known,

11    they would have said, you know what, I don't want the metal

12    liner.  I don't want the added risk that's coming from using

13    that metal liner with these particular femoral components

14    rubbing up against each other, despite the representations and

15    the indications from the -- from the manufacturer, that it seems

16    to be perfectly okay to do it.

17          THE COURT:  Very well.

18          MR. ZAJAC:  I -- I can't -- again, I can't get into

19    Dr. Terefenko's head and say what he knew, because I couldn't

20    take his deposition.

21          THE COURT:  All right.

22          When I take a look at the second amended complaint,

23    you claim that they introduced the optional metal liner for the

24    R3 Acetabular System, I believe, it was on February 27th of

25    2009, that's in your second amended complaint, Paragraph 91.

1          And the surgery was performed approximately, two

2     months later on April 29th of 2009, that's according to your

3     second amended complaint, Paragraph 106.

4          So, they argue that to the extent that you are

5     claiming a parallel claim, based on the failure to report at-

6     risk events to the FDA -- which you seem to be doing -- that the

7     claims fail because you lack causation, because it is not

8     plausible that enough adverse reports would have been generated

9     in the two-month period between the option metal liner being

10    introduced and the  -- the preceding two months before Mr.

11    Shuker's surgery to sort of, discourage your doctor from

12    performing or using the R3 metal liner.

13         What is your response to that argument -- two months

14    from the introduction -- that's the extension, right -- to have

15    pre-market approval and your -- your doctor's use of the R3

16    metal liner?

17         MR. ZAJAC:  Oh, I totally agree, two months would not

18    have been enough.

19         But the re --

20         THE COURT:  So --

21         MR. ZAJAC:  -- the recall was not based on information

22    that was gleaned from February of 2009 to April, 2009.  The

23    recall was based on information that was going back to Smith &

24    Nephew in the UK and it was based on that information.

25         THE COURT:  And what was that information?

1        MR. ZAJAC:  That there was a much higher failure rate

2   than what had originally been anticipated.

3        THE COURT:  With what, failure rate with what?

4        MR. ZAJAC:  With adverse events, including metal-on-

5   metal sensitivity.

6        THE COURT:  Okay.

7        MR. ZAJAC:  So, the -- the genesis of the recall was

8   not based on what was happening in the States.  Here's an

9   important fact and I apologize, I should have started with this.

10       The R3 metal liner was approved in Europe and other

11  parts of the country for use with the R3 Acetabular System.  So,

12  it was being used in that fashion in Europe and other parts of

13  the world.

14       And it was based on the feedback that was coming back

15  into the UK that they said, we've got to pull this thing from

16  the market.

17       So, I would agree that if the information was limited

18  to the FDA in the States, I wouldn't have enough.  But the

19  record is showing that it was based on information globally

20  coming back to Smith & Nephew in the UK.

21       THE COURT:  Very well.

22       I think I understand, anything else?

23       MR. ZAJAC:  No, your Honor, just to point out that

24  this is a motion for summary judgment situation and all

25  reasonable inferences are to be -- to be made in favor of the

1    non-moving party.

2         And that I would encourage the Court to consider my

3    counter statement of material facts to be deemed admitted,

4    because there was no effort under your rules to deny with

5    particularity anything in my counter statement of material

6    facts.

7              THE COURT:  Okay.

8              MR. O'QUINN:  And, your Honor, I -- I'd confess to

9    you, I am not aware of an obligation to respond to the counter

10   statement, I thought -- I was under the impression, we did not

11   have to do that.

12        But we did include in our brief, basically, a

13   paragraph that says, all of the counter statement is really

14   irrelevant, anyway, because the only material fact here is that

15   the R3 metal liner was PMA approved from the -- as part of the

16   BHR system, so that's our position on that.

17        Your Honor, I've tried to make a list of the points

18   and then, I'm going to try to do this as concisely as possible.

19             THE COURT:  All right.

20             Maybe, I have some --

21             MR. O'QUINN:  Sure.

22             THE COURT:  -- some more -- following up on the

23   packaging and the inserts in the --

24             MR. O'QUINN:  Yes, sir.

25             THE COURT:  -- in the R3 metal liner.

1      For doctor -- like, Dr. Terefenko here using it, off

2  label in a hip replacement procedure, what package insert or

3  labeling would he have received?

4      MR. O'QUINN:  Well, first of all, your Honor, there's

5  no allegation in the complaint, that he received this poly

6  liner.

7      And doctor -- doctor -- excuse me -- Mr. Rouse's

8  affidavit attached the correct surgical-technique brochure.

9      THE COURT:  What is the difference between the poly

10  and the --

11      MR. O'QUINN:  Okay.

12      THE COURT:  -- the other one.

13      MR. O'QUINN:  Let's -- let's -- that's a good

14  question.

15      The poly says, poly -- okay -- on the first page, it's

16  the 510K approved poly liner that we talked about last time when

17  we were here in March.

18      THE COURT:  Okay.

19      MR. O'QUINN:  Okay.

20      It's the poly liner.  You'd go through this surgical-

21  technique brochure, it does not demonstrate the technique with a

22  metal liner.  It makes no reference to the metal liner or any of

23  the risks that would be associated with the metal liner.

24      It does not have any part numbers that would

25  correspond to the metal liner.  It's for the poly liner.

1          THE COURT:  Now --

2          MR. O'QUINN:  This is -- you know --

3          THE COURT:  -- anybody who is trained, would know the

4    difference between a poly and a metal liner, right?

5          MR. O'QUINN:  I think it's -- thank you.

6          And not only that, the affidavit submitted by Mr.

7    Rouse attached the labeling that Dr. Terefenko would have

8    received.  It is the Birmingham Hip Resurfacing brochure for the

9    R3 Modular Acetabular Cups.

10         As I told you before, the cups -- and the liner -- got

11   their own separate brochure and this document is almost thirty

12   pages long, it's limited exclusively to the metal liner and

13   several times it says, note that in the U.S. the R3 metal liner

14   is intended for use as part of the BHR system only.

15         And by the way, he said that we weren't allowed to

16   call it the R3 metal liner, this is the FDA's approval labeling,

17   it calls it the R3 metal liner.

18         There is other inferences -- I won't go through them

19   all but I've cited them.  Here is another one, currently, Smith

20   & Nephew does not have a commercially-available femoral head for

21   use with a BHR resurfacing cup.  Therefore, you have to use the

22   resurfacing head, that's on Page 9.

23         So, the labeling that's the real labeling, not the

24   poly labeling, clearly, discloses the regulatory status.  It

25   calls it an R3 metal liner and it discloses the risks associated

1    with its use and it was a separate brochure approved by the FDA.

2            There is not allegation that Dr. Terefenko saw this

3    liner and as the Court pointed out -- come on -- he's an

4    orthopedic surgeon.  This guy is going to --

5            THE COURT:  Right.

6            MR. O'QUINN:  -- poly brochure and ignore the real

7    label?  I mean, that's just not plausible, your Honor.

8            THE COURT:  Okay.

9            I'm going to look at it a little bit different --

10           MR. O'QUINN:  Okay.

11           THE COURT:  -- with regards to this labeling and this

12   warning, because you have argued to me, that the FDA approved of

13   the -- approval -- of the labeling and the warning for the metal

14   liner, basically, says that you have to use that approval

15   process in labeling and warning, because the state law cannot

16   require any additional labeling or warning or modify the label

17   and warning in any way, that's your argument if I understand it

18   correctly?

19           MR. O'QUINN:  Yes, sir.

20           THE COURT:  I think predicated on the law.

21           But that's with regards to the metal liner and my

22   question to you now is -- and I understand that both of these

23   are in strict -- intrinsically, linked.

24           Can state law require additional warnings for the R3

25   Acetabular System which did not receive pre-market approval or

1   any kind of approval?

2          MR. O'QUINN:  That's an excellent question.  And the

3   answer is, no, because you're coming --

4          THE COURT:  Why not?

5          MR. O'QUINN:  -- in the back door, you're telling --

6   you're telling Smith & Nephew, that we have to put warnings

7   about how the metal liner should be used in other product

8   labeling besides the metal liner labeling.  That is an end run,

9   but it has the same effect.  You're imposing a requirement on

10  this liner, that the FDA did not impose.

11         For example -- that's a great question -- let me see

12  if I can think of an example.  You know, the example, we'll put

13  in the femoral head lining, that you shouldn't use it -- you

14  shouldn't use the liner off label.

15         THE COURT:  Well, or --

16         MR. O'QUINN:  The FDA has never said --

17         THE COURT:  -- or --

18         MR. O'QUINN:  -- you couldn't do that.

19         THE COURT:  -- or they could modify the warnings about

20  the R3 Acetabular System to warn that the system should not be

21  used with a metal liner, for example.

22         MR. O'QUINN:  No, they can't do that, your Honor,

23  because the FDA approved labeling says, you can use it with the

24  -- with the shell and the femoral component.

25         So, maybe, I don't understand your question.

1          THE COURT:  Well, I'm trying to get at what you --

2    we're focusing on the metal liner --

3          MR. O'QUINN:  Yes, sir.

4          THE COURT:  -- on the warnings and the metal liner and

5    they cannot be added or subtracted -- they cannot add or modify

6    them --

7          MR. O'QUINN:  Correct.

8          THE COURT:  -- in any way, shape or form, because that

9    would be a violation of -- of -- you have to follow the FDA

10   approval.

11         But looking at the other device, the R3 Acetabular

12   System -- okay -- which did not receive market -- pre-market

13   approval.  Can under state law, better warnings be required, so

14   that for example, don't use this system with the metal liner --

15   it's a problem?

16         MR. O'QUINN:  The answer is, no, because you're

17   still --

18         THE COURT:  Why?

19         MR. O'QUINN:  -- imposing a requirement on the metal

20   liner that the FDA did not impose, whether you put in another

21   component's labeling or in the R3 labeling, we would be required

22   to go beyond what the FDA said, we had to go with this labeling.

23         Anything we would put in that label, is over and above

24   what the FDA told us to do for the R3 metal liner.

25         THE COURT:  All right.

1       Could you touch upon -- I tried to get a response to

2  the argument that -- that they make -- about taking a look at

3  the devise as a whole and not the component -- component parts

4  -- in conducting my preemption analysis.

5       And I think I pointed out that the device is this

6  case, the -- it's a -- well, they argued that the device in this

7  case is a Class 2 5K clear system.

8       But my question was, isn't it true that the FDA has

9  never approved the 5K or pre-market approval process for the

10  particular devise that was used in the surgery, looking at it in

11  the argument of -- of the whole versus the component parts.

12       And my question was, doesn't the combination that has

13  not been approved distinguish the present situation from those

14  cases in which the 5K clear components are later incorporated

15  into a device that received pre-market approval?

16       Do you follow my question?

17       MR. O'QUINN:  I think so, your Honor, from the

18  briefing and I think --

19       THE COURT:  What -- what is your response, 'cause I

20  wasn't very --

21       MR. O'QUINN:  Well, it wasn't very clear to me, either

22  and I think it's a good question.  But the plaintiffs seem to be

23  saying one of two things.

24       Either they're saying that, because it was approved

25  with the system, it didn't get approved as a component.  And I

1   think they've retreated from that.  It clearly got approved as a

2   component.

3           So, the question becomes what happens when the doctor

4   uses it outside that system in an off-label fashion?

5           And I think the law is crystal clear, that it doesn't

6   change the preemptive effect that attached to that FDA approval.

7   The FDA has never given us a 510K approval for this liner.

8           The only way we were allowed to ship it in interstate

9   commerce is by making it a part of the BHR system and labeling

10  it as part of that system, which we did and it was used off

11  label, that doesn't change it.

12          If I may also, your Honor, while it's fresh in my

13  mind, Mr. Zajac raise several times what he claims to be the

14  most important point he wants you to remember, a policy argument

15  that the FDA has never looked at the articulation between this

16  liner and this femoral head.  That is true in every off-label

17  use.

18          He said, in _Regal_, you know, the Supreme Court made it

19  clear that you get a PMA because it's been vetted and tested, et

20  cetera.  The product in _Regal_ had not been tested or cleared for

21  an off-label use.  It never is.  What an off-label use means is,

22  that you've not given enough information to the FDA for them to

23  have made the determination whether they should clear it or

24  approve it.

25          So, that policy argument applies to every off-label

1  use.  It applied in the Supreme Court case in <u>Regal</u> and it

2  applies in every off-label case.  The FDA does not approve off-

3  label uses, that's why they're off label.

4          THE COURT:  Yes.

5          MR. O'QUINN:  Excuse me, I wanted to throw in.

6          THE COURT:  Okay.

7          I -- I guess, the troubling part from the beginning

8  with -- with this case and I guess, it's -- it's the troubling

9  part for the plaintiff is the fact that you have a component

10  part of a different system, in this case, the BHR that is

11  approved as a system -- that component part -- and then, it's

12  taken and it's being used with another system to conduct a

13  surgery.

14          And the -- the -- what I'm trying to get my head

15  around is the fact that, that because it had pre-market

16  approval, it -- it preempts, even though it's a component part

17  of the new system.

18          MR. O'QUINN:  Our position is not that there was a new

19  system formed when the R3 liner was used off label.  They keep

20  saying, that's our position, it's not.

21          Our position is that their claim attacks the R3 metal

22  liner.  And I think they finally admitted that, they dance

23  around it, they dodge around it, but that's what all their

24  papers say.

25          And --

1          THE COURT:  I -- I think --

2          MR. O'QUINN:  -- you can't change that, because it was

3     used off label.

4          And I -- I'll say this, it is a very unique body of

5     law, because you've got this very arcane regulatory system about

6     how devices are put on the market and how they're controlled and

7     -- and labeled, so -- and I can understand, obviously, it is

8     kind of complicated.

9          But if you look at the case law, I think the -- the

10    result is pretty clear, you can't change the design or labeling

11    when it came to this component, even if it was used off label.

12         And they cannot show you and still have not shown you

13    a plausible parallel claim.

14         When you asked about the -- the off-label promotion to

15    Dr. Terefenko, they mentioned the press release, it's attached

16    to my opposition, the second sentence:

17              The metal liner was recently approved by the

18         Food and Drug Administration for use with the Birmingham

19         Hip Resurfacing system.

20         The second sentence discloses the regulatory status.

21    The labeling discloses the regulatory status.

22         And he -- and Mr. Zajac keeps saying and I've had a

23    limited record.  Your Honor, he -- he's submitted sixty-nine

24    requests for production to us.  Forty-two requests for

25    production to the FDA.

1    The original discovery cutoff in this case was in

2    March, it wasn't until we filed the preemption motion and heard

3    it in March, that your Honor pushed everything back.  They never

4    took Dr. Terefenko's deposition.

5    And furthermore, Dr. Terefenko is Mr. Shuker's doctor.

6    Why can't he just pick up the phone and say, I'd like to make an

7    appointment to see how this product was marketed to you?

8    But as we sit here today after all of this time and

9    all of this opportunity, we've got a press release that

10   discloses the regulatory status.

11   THE COURT:  Very well.

12   (Pause at 3:28 p.m.)

13   THE COURT:  Let me -- let me ask -- I think, Attorney

14   Zajac took issue with my statement or -- or reading, 'cause I

15   was trying to say whether -- is it a correct reading of the

16   complaint, that Mr. Shuker's injuries were caused by the metal-

17   on-metal articulation of the components used in the hip

18   replacement, so that both the use of the metal liner and the use

19   of the metal femoral head --

20   MR. O'QUINN:  Your Honor --

21   THE COURT:  -- and he said it was too narrow.

22   MR. O'QUINN:  He said that originally and did kind of

23   spar with your Honor with -- on that a little bit.  Eventually,

24   I think, he did admit that all their claims go from the

25   articulation of the metal liner with the other components.

1      And we can both -- he and I can both sit here -- but I

2 can give you the citations.

3      THE COURT:  Okay.

4      MR. O'QUINN:  Paragraph 43 to 59 of the first amended

5 complaint, it talks about -- and I've read it to your Honor in

6 my argument -- the interfacing of the liner with the ball -- the

7 -- the femoral head.

8      Your Honor asked, why was the market -- why was the

9 product pulled from the market?  The MHRA -- that's the United

10 Kingdom regulatory agency -- reported that the R3 metal liner

11 had a higher revision rate.  That's Paragraph 50.  Not in the

12 other thing -- the liner.

13      And in Paragraph 59, Dr. Terefenko determined that the

14 pain that Mr. Shuker was experiencing was caused by metal

15 sensitivity due to the -- excuse me -- due to the degeneration

16 of the metal-on-metal articulation.  And again, that's defined

17 in Paragraph 43 as the rubbing of the liner.

18      Then, in their response to the undisputed facts in

19 Paragraphs 33 and 35, they complain about the articulation of

20 the liner with the other components.

21      In their opposition to the motion for summary

22 judgment, itself, on Pages 6 and 7 and 12, they argue that the

23 problem was caused because of the articulation of the liner with

24 the shell and the femoral component.  There are no specific

25 allegations relating to any other components, they're all

1  conjoined with the metal liner.

2          You don't have to believe me, obviously, you can look

3  at it for yourself and that's what I would refer the Court to.

4          THE COURT:  Okay.

5          So, the problems for the -- they won't have similar

6  problems -- the product was pulled in the United States?

7          MR. O'QUINN:  Yes, sir.

8          THE COURT:  Do you remember when I questioned her

9  about the two-month period as being sufficient --

10          MR. O'QUINN:  Yes.

11          THE COURT:  -- enough for you to be aware of the

12  problems?   She said, well, look back --

13          MR. O'QUINN:  Right.

14          THE COURT:  -- 'cause you have the same problems in

15  England -- in -- where you were marketing it before.

16          MR. O'QUINN:  It was a good answer on its feet, but

17  it's wrong and here's why.

18          The product received FDA approval and was released in

19  the United States in February of '09.  We had already given to

20  the FDA, all of the information about what it had done

21  worldwide.

22          When you get a PMA, you come in and you say, here's

23  this and here's that and this product is already on the market,

24  so they already had information on the liner and the BHR system.

25  That two-month window, wasn't going to change what the FDA had

1  just told us was okay.

2      So, it's kind of like the -- the clock started running

3  again, when we got that FDA approval.  All of that information

4  that was out there worldwide was part of the FDA's calculus and

5  the FDA approved it in 2009.  And then, two months later, Mr.

6  Shuker got a surgery that, unfortunately, turned out -- you know

7  -- apparently, bad for him and -- you know.

8      THE COURT:  Very well.

9      MR. O'QUINN:  But there couldn't -- nothing in the

10  U.S. changed that approval.

11      THE COURT:  Okay.

12      MR. O'QUINN:  Is there anything else, your Honor?

13      THE COURT:  No, thank you.  I think you've answered my

14  questions.

15      MR. O'QUINN:  Thank you very much, your Honor, I

16  appreciate --

17      THE COURT:  Thank --

18      MR. O'QUINN:  -- it.

19      And I also appreciate your letting us re-file it as a

20  summary judgment after the 12(b)(6) issues.  Thank you very

21  much.

22      THE COURT:  Very well.  Thank you very much.

23      I'll take it under advisement.  I'll issue an order in

24  due course.

25      MR. ZAJAC:  Thank you, your Honor.

1        THE COURT:  Thank you.  Have a good day.

2        MR. ASTRACHAN:  Thank you.

3        ESR OPERATOR:  All rise.

4        THE COURT:  Thank you.

5        We have a criminal case coming up.

6        (Adjourned in this matter at 3:31 p.m.)

7                              * * *


C E R T I F I C A T E

_____I do hereby certify that the foregoing is a correct

transcript of the electronic-sound recording of the

proceeding in the above-entitled matter.


_____       Date: July 20, 2014
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270